CARL G. DREYMANN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 12707.   Promulgated August 9, 1948.

*Sidney B. Gambill, Esq.*, for the petitioner.
*Homer F. Benson, Esq.*, for the respondent.

OPINION.

HILL, *Judge*: The respondent urges that petitioner assigned only his future earnings or income and that under the rule of *Lucas* v. *Earl*, 281 U. S. 11, and *Helvering* v. *Horst*, 311 U. S. 112, all of the "royalty" income here involved is includible in petitioner's gross income. We do not agree with this contention.

It is well settled that agreements to assign future inventions may be specifically enforced. *Littlefield* v. *Perry*, 88 U. S. 205, 226; *Conway* v. *White*, 9 Fed. (2d) 863, 866; Ellis, Patent Assignments and Licenses (2d Ed.), § 73, p. 81. In *Conway* v. *White, supra,* the court stated as follows:

* * * agreements to assign any future inventions one may make may also be specifically enforced. Such contracts are not contrary to public policy, and are not on that account necessarily invalid. * * *

It is likewise true that an agreement to assign the invention need not be in writing to be specifically enforceable. See Ellis, *supra*, § 227, p. 250; § 289, p. 308.

In the instant case the record shows that petitioner orally agreed in September 1932 that his daughter should have an undivided one-half interest in the moisture-proofing process when and if it was found and that she should receive one-half of whatever was realized from such interest. That agreement was based upon the valuable and vital assistance which she was to, and did, render to petitioner in finding the process and in its subsequent development and improvement. In accordance with the above agreement, she commenced working for petitioner in September 1932 and from that time until the process was found in the period between April and August 30, 1933, she aided petitioner substantially in the research and experimentation leading to its reduction to practice. She continued working for petitioner in the subsequent development and improvement of the process and in the method of its production until 1942. Hence, we believe that by virtue of the above agreement Annie, having performed her part, acquired a one-half equitable interest in the moisture-proofing process the moment it was created. Her equitable title was recognized by Grant in the contract of August 30, 1933, when it agreed to pay her

one-half of 5 per cent of the gross sales of the product which it marketed. Her right to legal title was specifically enforceable in equity, and, as of the time her equitable title vested, she had a right, title, and estate in and to property.

Respondent contends that the contracts between petitioner and Grant signed in April 1933 and on August 30, 1933, the application for a patent dated May 17, 1934, and the assignment of the patent made on August 22, 1935, all indicate that petitioner alone had title to the invention. It is true those instruments were all either signed by or issued in petitioner's name only. Upon the record, however, we do not believe these instruments negative the fact that it was petitioner's intent and desire that Annie should have one-half of the invention and that Annie did acquire such an interest.

It is thus apparent that the thing assigned in the instant case was not petitioner's future salary or personal earnings, as in the *Earl* and *Horst* cases, *supra;* it was, instead, an interest in property. Since the "royalty" income in question stemmed from a property interest one-half of which was owned by Annie, it follows that only one-half of the income here in question is includible in petitioner's gross income. See *Nelson* v. *Ferguson,* 56 Fed. (2d) 121; *Hall* v. *Burnet,* 54 Fed. (2d) 443.

Petitioner contends that the "royalty" payments received under the contract with Grant, executed on August 30, 1933, were capital gain, not ordinary income as reported in his return, and that only a percentage of such gains should be taken into account in computing his net income. He points out that the term "royalty" as used in that contract is a misnomer and that the "royalty" payments commenced in 1936 were part of the periodic payments which constituted the purchase price of the invention. We agree. See *Kimble Glass Co.,* 9 T. C. 183; *Commissioner* v. *Celanese Corporation,* 140 Fed. (2d) 339.

Respondent contends that the payments in question were ordinary income, for the following reasons: (1) The property (invention) was sold on August 30, 1933, and, therefore, was not a capital asset in accordance with section 101 (c) (8) of the Revenue Act of 1932 [1] because petitioner did not hold it for more than two years, (2) the property sold was not a capital asset because it was held by the petitioner primarily for sale to customers in the ordinary course of his trade or

---

[1] SEC. 101. CAPITAL NET GAINS AND LOSSES.

\* \* \* \* \* \*

(c) DEFINITIONS.—For the purposes of this title—

\* \* \* \* \* \*

(8) "Capital Assets" means property held by the taxpayer for more than two years (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale in the course of his trade or business. \* \* \*

business, and (3) the application of the capital gains limitation would produce consequences repugnant to the intent and purpose of Congress in that petitioner did not sell the process for one lump sum. We believe respondent's contentions are without merit.

Refutation of respondent's first argument lies in answering the question, When was the invention sold? Respondent contends it was sold on August 30, 1933, and that, since the process was reduced to practice some time between April 1933 and August 30, 1933, it was not a capital asset, as petitioner did not hold it for more than two years as required by section 101 (c) (8), Revenue Act of 1932. We do not agree that the contract of August 30, 1933, constituted a sale of the invention. A sale connotes a closed transaction. *J. T. Wurtsbaugh*, 8 T. C. 183, 189, and cases cited therein. In the contract of August 30, 1933, petitioner agreed to assign the patents to Grant when issued, but title to the invention did not pass to Grant at that time. That agreement constituted an executory contract to assign the invention and the patent on a future date. Consequently, since there was no present passing of title to the invention indicated by that contract, there was no sale within the purview of the statute. The assignment executed by petitioner on August 22, 1935, however, did constitute a closed transaction. That assignment reads in part as follows:

* * * I, the said Carl G. Dreymann, have sold, assigned, and transferred, and by these presents do sell, assign, and transfer unto the said Grant Paper Box Company the full and exclusive right, title and interest in and to the said invention set forth and described in the specification forming part of the above recited application or intended so to be, and in, to, and under the above recited application, * * *

Neither the provision that Grant could not assign or license the invention, nor that title to it would revert to petitioner in the event of the former's becoming bankrupt militated against the validity of the assignment. See Patent Assignments and Licenses, Risdale Ellis (2d Ed.), 1943, sec. 124, p. 148, *Platt* v. *Fire Extinguisher Mfg. Co.*, 59 Fed. 897; *Commissioner* v. *Celanese Corporation, supra*.

Hence, the Revenue Act of 1934[2] is applicable in determining whether or not the invention was a capital asset. By the definition of that term contained in that act, the period for which the property was held became immaterial. The invention, therefore, was a capital

---

[2] SEC. 17 [Revenue Act of 1934]. CAPITAL GAINS AND LOSSES.

* * * * * * *

(b) DEFINITION OF CAPITAL ASSETS.—For the purposes of this title, "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

asset unless it can be proved that it falls within one of the specific exclusions of section 117 (b) of that act.

Respondent argues that, even if the invention was sold on August 22, 1935, still it was not a capital asset, as it was held by petitioner primarily for sale to customers in the ordinary course of his trade or business. He cites as authority for such argument *Harold T. Avery*, 47 B. T. A. 538. In that case the taxpayer was engaged in the business of inventing and selling patents outside of and in addition to his regular employment. The taxpayer there was in no way obligated to transfer the inventions and patents to his employer. He had disposed of five inventions to three different persons prior to the disposition of the invention there in question. We believe the facts in the instant case are clearly distinguishable. The evidence shows petitioner never attempted to sell the invention to any one except Grant, nor did he ever develop a scientific hobby outside of his employment into a business. At the time he discovered the process in question he was employed by Grant. He had been engaged over a period of years in manufacturing and working as a chemical and consulting engineer. He testified that the primary reason why he became interested in developing the process in question was to enable him to get back into manufacturing. The patent he sold shortly after the end of World War I was his only previous record of a patent sale. We do not believe the above facts support respondent's contention that petitioner held his invention primarily for sale to customers in the ordinary course of his business. See *Edward C. Myers*, 6 T. C. 258, 266.

We do not agree with respondent's contention that to apply the benefits of the long term capital gains provisions to the amounts received from Grant in the years here involved would be repugnant to the "underlying theory of the capital gains limitations." He argues that the purpose of the capital gains limitations is to lessen the impact of the Federal income tax "on the realization in one lump sum in one taxable year of an increment in value which had taken place over a number of years." Since petitioner here did not sell the process for one lump sum, he concludes, the application of the capital gains limitations in the case at bar would defeat the intent and purpose of Congress. In the first place, section 117 of the Revenue Act of 1934 did not contain any provision to the effect that payment from the sale of a capital asset must be in one lump sum. Respondent supports his position, however, by pointing to House Report No. 350, 67th Cong., 1st sess. (C. B. 1939-1 (Part 2), p. 176). That report accompanied the Revenue Act of 1921, which first introduced the capital gains provision into our taxing statute. It reads in part as follows:

Section 206: The sale of farms, mineral properties, and other capital assets is now seriously retarded by the fact that gains and profits earned over a series of

years are under the present law taxed as a lump sum (and the amount of surtax greatly enhanced thereby) in the year in which the profit is realized. * * *

See also C. B. 1939–1 (Part 2), p. 189, and S. Rept. No. 275, sec. 206.

There is nothing in the House report or in the Senate report which supports respondent's assertion that a taxpayer, in order to have the tax benefit of the capital gains provisions, must sell his asset for one lump sum. As a matter of fact, this and other courts have held that where, as here, the consideration for the sale of a capital asset was in the form of periodic payments based on a percentage of the gross sales made during the year, the taxpayer was entitled to a capital gains limitation on the sums received in each year. See *Commissioner v. Celanese Corporation, supra; George James Nicholson*, 3 T. C. 596, and cases cited therein. We can find no valid reason for holding otherwise in this case.

Having determined the invention was a capital asset and that the application of the capital gains limitation is not violative of Congressional purpose, we must next ascertain how long petitioner held the invention before it was assigned. This is important with respect to the year 1941 because, if the invention was held for more than 18 months and not more than 24 months, only 66⅔ per cent of the gain would be taken into account in computing net income; if it was held for more than 24 months only 50 per cent would be taken into account.[3] See *Harry B. Golden*, 47 B. T. A. 94.

With respect to the taxable years 1942, 1943, and 1944, if petitioner held the invention for more than 6 months, only 50 per cent would be taken into account. It is not known on what date between April 1933 and August 30, 1933, petitioner reduced the invention to practice. Since petitioner sold the process on August 22, 1935, he must show that it was reduced to practice sometime prior to August 22, 1933,

---

[3] The section of the Internal Revenue Code applicable to the taxable year 1941 is as follows:

"SEC. 117. CAPITAL GAINS AND LOSSES.

   *       *       *       *       *       *       *

"(b) PERCENTAGE TAKEN INTO ACCOUNT.—In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income:

"100 per centum if the capital asset has been held for not more than 18 months;

"66⅔ per centum if the capital asset has been held for more than 18 months but not for more than 24 months;

"50 per centum if the capital asset has been held for more than 24 months."

The section of the Internal Revenue Code applicable to the taxable years 1942, 1943, and 1944, is as follows:

"SEC. 117. CAPITAL GAINS AND LOSSES.

   *       *       *       *       *       *       *

"(b) PERCENTAGE TAKEN INTO ACCOUNT.—In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:

"100 per centum if the capital asset has been held for not more than 6 months;

"50 per centum if the capital asset has been held for more than 6 months."

before we can say that he held the asset for more than 24 months. See *Harriet M. Hooper*, 26 B. T. A. 758. However, he has failed in his burden of proving that fact; he has proved only that the invention was reduced to practice sometime in the period between April 1933 and August 30, 1933. Hence, we hold that the proof shows that petitioner held the invention here involved for more than 18 months but does not show that he held it for more than 24 months. Since petitioner does not contend that he had any unrecovered cost basis of the invention, as to the year 1941, 66⅔ per cent of his total gain should be taken into account in computing his net income, and as to the years 1942, 1943, and 1944, 50 per cent of his total gain should be taken into account.

*Decision will be entered under Rule 50.*