Barron Kidd v. Commissioner. Helen Ulmer Kidd v. Commissioner. A. W. Cherry v. Commissioner. Helen Gholson Cherry v. Commissioner.
Kidd v. Commissioner
Docket Nos. 14904, 14905, 14906, 14907.
United States Tax Court
1948 Tax Ct. Memo LEXIS 86; 7 T.C.M. (CCH) 685; T.C.M. (RIA) 48187; September 29, 1948
George S. Atkinson, Esq., and Tom B. Rhodes, Jr., Esq., Dallas National Bank Bldg., Dallas, Tex., for the petitioners. Donald P. Chehock, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion In these consolidated proceedings, respondent determined deficiencies in income tax for the year 1943, and by amendment to answer has sought increased deficiencies as follows: Docket
Number
Petitioner
Deficiency
Increase
14904
Barron Kidd
$4,522.03
14905
Helen Ulmer Kidd
4,521.18
14906
A. W. Cherry
4,955.83
$1,185.83
14907
Helen Gholson Cherry
4,957.92
1,185.89
The year 1942 is involved by virtue of the provisions of the Current Tax Payment Act of 1943. One issue having been settled by stipulation, *87 the basic problem that remains is whether certain oil and gas properties sold by partnerships of which petitioners were members, and others sold by the individual petitioners, were capital assets, or whether they were properties held primarily for sale to customers in the regular course of business, within the purview of section 117 (a) and (j) of the Internal Revenue Code. More specifically the questions presented are these: (1) Were the leases, royalties, and interests sold by the partnership of Kidd & Cherry in 1942 and 1943 properties held by the partnership primarily for sale to customers in the ordinary course of its trade or business? Should we decide the first question in the affirmative, then the alternative point arises whether the loss resulting from the sale of the so-called Glaze and Coulter leases by the partnership of Cherry, Kidd & Sloan in 1942 is deductible by petitioners as an ordinary loss. (2) Were the so-called Slaughter and Andrews County leases, sold by the petitioner Barron Kidd and his wife as individuals in 1943, property held by these petitioners primarily for sale to customers in the ordinary course of their business? (3) Was the so-called Utter *88 overriding royalty, sold by petitioners A. W. Cherry and his wife as individuals in 1942, property held by these petitioners primarily for sale to customers in the ordinary course of their business? The third question is raised by respondent in the amendment to answer and is the basis for the increased deficiencies in two of the dockets. Findings of Fact Petitioners Barron Kidd and Helen Ulmer Kidd are husband and wife, as are A. W. Cherry and Helen Gholson Cherry. Hereinafter Barron Kidd and A. W. Cherry will be referred to as petitioners. All are and have been residents of the State of Texas and all income here in issue was community income. Their tax returns, prepared on a calendar year-cash basis, were filed with the collector for the second district of Texas at Dallas. In January 1939 as a result of an oral agreement, petitioners formed a partnership known as Kidd & Cherry with office headquarters at Midland, Texas. Each was to share in profits and losses to the extent of one-half thereof. Both were experienced oil men. Kidd took courses in geology, law, and business administration at the University of Texas until 1925. Thereafter, he worked for a lumber company at *89 Orange, Texas, for about eighteen months. In 1927, he entered the employ of a small corporation which was attempting to obtain oil production and which did at a later date produce oil. He remained with this corporation until 1936, devoting all of his time to the affairs of the company, buying leases, running the office, appraising properties submitted for purchase, and helping finance the operations of the company. In 1936 he went into the oil business for himself and bought some oil leases in Texas in an effort to secure oil production. He first went to Midland, Texas, in 1930; and there about 1934 he met Cherry. Cherry finished high school and for over one year attended Texas Christian University, leaving college in 1923. He then went to Corsicana, Texas, and for about two years worked for Humble Pipe Line Co., after which he commenced working for various construction companies, building oil pipe lines in the United States. In 1932, he quit that type of work and began drilling oil wells. He bought old stripper oil wells and attempted to improve them; if unsuccessful, he would pull the pipe out and sell it. Thereafter, for his own account or in partnership with D. J. Findley, he *90 explored for crude oil and drilled oil wells and produced crude oil prior to the time he became associated with Kidd. During 1942 and 1943 petitioners devoted substantially all of their time on behalf of the partnership business. Kidd spent most of his time in office work, while Cherry did most of the field work. On the partnership returns of income for the years 1939 to 1945, the nature of the partnership business was stated to be: 1939
Purchase and sale of oil and gas leases
and royalties
1940
Crude oil production
1941
Oil operators
1942
1943
1944
Oil production
1945
Oil producers
The partnership was formed for the purpose of exploring for oil, producing oil and the buying and selling of oil and gas leases and other interests pertaining thereto. A definite method of operation was instituted at the outset which was followed throughout all the years. In order to extend operations as widely as possible with minimum risk and minimum capital, the method devised was to sell a lease or an interest therein each time a drilling operation was undertaken. The leases and interests which the partnership acquired were purchased after a geological survey, made *91 generally by geologists in their employ, indicating the possibility of production. Kidd & Cherry dealt mostly in "wildcat" oil properties. Separate leases had to be obtained from each landowner. Some of the properties were acquired and were sold unconditionally; others, under an agreement to drill a well or to contribute to the cost of such drilling. At the time of the acquisition of the various properties Kidd & Cherry did not intend to retain the whole of each property, but, rather, intended and followed the general practice of disposing of some interest therein, and at times the whole of the property acquired, thereby receiving capital which permitted other operations, and spread their risk as well. Most of the sales made by the partnership were at a profit. There was no established technique followed by the partnership in disposing of the leases or interests. Sometimes they approached prospective customers; on other occasions they were approached by buyers. All expenses incident to the acquisition and sales were charged on the partnership books as business expenses and were so treated for tax purposes. On the partnership returns for the years 1939, 1940 and 1941, income from *92 "Commissions Earned" was reported. The following is a summary of the leases or interests acquired and sold by Kidd & Cherry: Year
Acquired
Sold
1939
200
55
1940
21
26
1941
18
11
1942
10
21
1943
67
50
1944
[1]
56
1945
[1]
40
The 71 sales made in 1942 and 1943 were of the following interests: 50 sales of lease interests, following its usual practice of selling a one-half interest for a profit and retained the other one-half interest for production. 10 sales of whole leases 4 sales of royalty interests 3 lease sales of acreage out of larger tract. 1 sale of whole lease except retention of override 1 producing lease 1 whole royalty 1 royalty sale of acreage. Of the leases or interests acquired in 1942, portions of 6 were sold in the same year. There were over 35 sales in 1943 of interests acquired in that year. In each of the years, Kidd & Cherry surrendered, or permitted to expire, a number of leases that had no real value either for purposes of production or sale. Based upon figures appearing in the partnership returns of income, the following is a general allocation of the partnership's *93 net income between sales and production, there being excluded income of approximately $93,500 received from Cherry, Kidd & Lambert: [2]
Net Production
Income
Net Sales Income [3]
(before depletion)
1939
$ 7,863.05
($ 5,354.26)
1940
[4] 22,739.60
( 11,807.34)
1941
(622.38)
14,813.97
1942
47,116.05 [5]
35,747.93
1943
46,295.68
87,861.47
1944
201,194.07
( 4,318.67)
1945
25,360.14 [6]
( 32,200.01)
From 1939 to 1943 Kidd & Cherry developed or acquired 22 producing leases. As of January 1948, the whole interest in 13 of these and the fractional interest in 2 others had been sold. Seven sales were made in 1946. At that time pressure was being *94 brought against the partnership by a bank which desired that the partnership's indebtedness be reduced. In May 1941, Kidd & Cherry entered into a partnership with Burr Lambert, the partnership venture being known as Cherry, Kidd & Lambert, for the purpose of exploring for and producing crude oil. Kidd & Cherry had a 50 per cent interest in the assets, profits and losses of Cherry, Kidd & Lambert and Burr Lambert had the other 50 per cent interest. Some oil and gas leases were acquired by Cherry, Kidd & Lambert, and it drilled approximately 23 producing oil wells. The maintenance of a separate set of books for the Cherry, Kidd & Lambert venture proved burdensome, so Cherry, Kidd & Lambert was formally dissolved December 31, 1943. From and after December 31, 1943, Kidd & Cherry continued to operate the properties and it billed Lambert at the end of each month for his one-half of the costs. The leases, royalties and interests sold by Kidd & Cherry in 1942 and 1943 were properties held primarily for sale to customers in the ordinary course of the partnership business. In July 1940, Kidd & Cherry entered into a partnership arrangement with Sloan & Hightower, this partnership being *95 known as Cherry, Kidd & Sloan. Kidd & Cherry owned a one-half interest in the assets, profits and losses and Sloan & Hightower the other one-half. The purpose of this arrangement was the exploration for and production of crude oil. This partnership's sole income was from oil production. Several properties were acquired, and Kidd & Cherry drilled wells thereon. The development and operation of the properties were under the supervision of Kidd & Cherry and were handled through its office. Although the final Partnership Return of Income of Cherry, Kidd & Sloan was filed for the period ended December 31, 1942, and Cherry, Kidd & Sloan was formally dissolved on that date, the operation of the properties remained unchanged. Kidd & Cherry took over the bookkeeping directly instead of keeping two sets of books, and billed Sloan & Hightower for its half of the costs. The Mary Glaze, John W. Coulter, Packet Realty, W. W. Gray, R. E. Gardner and Mary McIntosh, leases, all producing, were owned by Cherry, Kidd & Sloan. The leases were carried on the books of Cherry, Kidd & Sloan as assets of that partnership, with Kidd & Cherry and Sloan & Hightower each having its capital account on the books. *96 In 1942 the Glaze and Coulter leases were sold at a loss, and the sale reported on the income tax return of the partnership as a capital loss. No other sales of leases, or interests, were made by Cherry, Kidd & Sloan during its existence. Upon the dissolution of Cherry, Kidd & Sloan, the Packet Realty, W. W. Gray, R. E. Gardner and Mary McIntosh leases were thereafter carried on the books of Kid & Cherry as assets of the Kidd & Cherry partnership. The Glaze and Coulter leases sold by Cherry, Kidd & Sloan in 1942 were not properties held primarily for sale to customers, but were held primarily for investment purposes. In 1943 Kidd sold the so-called Slaughter lease at a profit of $745.53 and the so-called Andrews County lease at a profit of $212 and reported the gain as a long-term capital gain. Respondent determined that the gain was ordinary income as the leases were held primarily for sale to customers in the ordinary course of petitioners' business. Prior to the formation of Kidd & Cherry, Kidd sought to acquire various interests for production purposes. Among those were the Slaughter and Andrews County leases. Thereafter, he acquired individually only two properties. From *97 1939 to 1942 he forfeited, or surrendered, 13 leases and during the period 1939 to 1943 he sold 7 leasehold or royalty interests. Commencing in 1937, and for each year thereafter through 1943, Kidd was licensed by the State of Texas as a securities dealer. The licenses were obtained for him by his brother who did some clerical work for him and Kidd & Cherry. His brother did not consult petitioner prior to the acquisition, or renewal, of the licenses, but acted on the general opinion in the community that it was simpler to purchase the license than to contest the State's possible action. During the calendar years 1942 and 1943 Kidd individually received no commissions for disposing of oil properties for other individuals. Of three amounts reported in his income tax returns as commissions received during the calendar years 1939, 1940, and 1941, one represented an amount received by Kidd in lieu of a promised one-half interest in a lease if the lease were drilled, and another represented an amount received from Tuesday Oil Co. upon sale of a royalty in which Kidd had an interest, the sale being made by Tuesday Oil Co. without consulting him. Kidd had owned the Slaughter lease with *98 a party named Staley since 1937. Staley desired to sell and Kidd joined in the sale. Kidd also owned a one-half interest in the Andrews lease and sold it when the other owner sold, reserving an overriding royalty with the understanding that the purchaser would drill a well thereon. The Slaughter and Andrews leases were held by Kidd and his wife primarily for investment purposes and not for sale to customers in the ordinary course of business. In 1942 Cherry sold the Utter overriding royalty for $3,800, reporting the profit as a long-term capital gain. By affirmative plea in his amendment to answer, respondent has determined that the gain from the sale was ordinary income and not capital gain. This royalty was Cherry's share of a distribution by Kidd & Cherry, which he held for about two years. His reason for the sale was to receive cash with which to repay certain outstanding obligations. On their 1943 tax returns, Cherry and his wife reported long-term gains of $75 each on the sale of property which they later discovered did not belong to them. Upon this discovery, the proceeds were turned over to the rightful owner, George Shelton. Respondent now concedes that the "sum was *99 not income, and should not have been reported." During the period 1939 to 1943 Cherry sold 7 oil properties or interests therein. Most of the sales were of properties formerly owned by the partnership of Cherry & Findley. Upon the latter's death, it became necessary to sell some of the partnership properties in order to pay debts to settle the estate. During the same period Cherry did not acquire individually any oil leases, or royalties or interests. During the calendar years 1942 and 1943, Cherry individually received no commissions for disposing of oil properties for other individuals. Of the two amounts reported in his income tax return and the income tax return of his wife as commissions received during the calendar years 1939, 1940, 1941, one represented an amount received from Tuesday Oil Co. upon the sale of a royalty in which Cherry had an interest, the sale being made by Tuesday Oil Co. without consulting him. The Utter overriding royalty was held primarily for investment purposes and not for sale to customers in the ordinary course of Cherry's business. Opinion KERN, Judge: The underlying problem in these proceedings is whether the various properties sold in the *100 tax years were capital assets as defined in section 117 of the Internal Revenue Code, the pertinent provisions of which are set out in the margin. [7]
*101 The first issue brings into focus the transactions of the partnership of Kidd & Cherry, composed of the two partners who are petitioners herein. During the years in question the partnership sold various oil leases and other similar property interests upon which it realized gain. These sales were not isolated, infrequent nor unusual; on the contrary, they were not only frequent and continuous, Snell v. Commissioner, (CCA-5), 97 Fed. (2d) 891, but also were of properties acquired for the purpose of sale, Julius Goodman, 40 B.T.A. 22. The testimony of the two partners, [8] as well as their statements upon brief [9] clearly demonstrate that the properties sold were acquired and held, "primarily for sale to customers in the ordinary course of * * * trade or business." The other evidence in the record also leads to the conclusion that the properties sold by the partnership were not capital assets.
*102 On the first issue, this record is much stronger for respondent than was the record in Greene v. Commissioner, (CCA-5), 141 Fed. (2d) 645, certiorari denied, 323 U.S. 717. There, petitioners' income tax liability arising from profits earned upon 37 sales of interests in oil and gas leases was brought into question. Respondent asserted that the properties were not capital assets but were held primarily for sale to customers in the ordinary course of business. His determination was sustained. The testimony as summarized by the Court is as follows: "At the hearing in the Tax Court Mr. Greene testified that he was always ready and willing to sell any property owned by the community if offered a purchase price that he considered good, and that at the time he acquired each property he did not know whether he would hold it for investment or speculation, develop it, sublease it, sell it, or abandon it. It was his general policy to purchase 'wilcat' properties and to deal therein in accordance with his best business judgment as to prospects for its successful development. * * *" It concluded: "* * * The properties sold were of comparatively recent acquisition, *103 and not one of them was productive of any income at the time it was sold. The substance of petitioners' testimony was to the effect that they had neither the capital nor the inclination to hold for investment more than a chosen few of all the properties held. "We think the facts were consistent with and justified the inference that the properties sold in 1938 and 1939 were held primarily to be sold in the ordinary course of business." Contrary to petitioners' contention, we need not denominate the precise nature of the partnership business. It is sufficient to find that as an adjunct of its business the sales in question were a necessary activity. Even if it were the fact, and we have not been shown that it is, that the selling operations were not the principal business, it is undisputed that these operations were an ordinary feature of the partnership business. The partnership was created with the view that purchases and sales were to be an important - actually an indispensable - phase of its operations. That they were is convincingly demonstrated by the pattern of the business, the continuous sales, the income thus derived, and all of the other circumstances attending the conduct *104 of the partnership affairs. The disposition of this issue in respondent's favor is required, we believe, not only by the Greene case, but by such other decisions as A. R. Calvelli, 43 B.T.A. 6; Joe B. Fortson, 47 B.T.A. 158; The Kanawha Valley Bank, 4 T.C. 252, and Harry Dunits, 7 T.C. 672, affirmed (CCA-6), 167 Fed. (2d) 223. In each of these cases the taxpayer's business consisted of more than the sales of the properties that were involved. In fact, in the Calvelli case, this Court recognized that the taxpayer's "greater interest was in building houses" and not in selling the lots, which were sold. The Court further observed: "Both were parts of petitioner's business." Petitioners urge that the controlling authorities are, inter alia, Francis M. Weld, 31 B.T.A. 600; Thompson Lumber Co., 43 B.T.A. 726, and Three States Lumber Co. v. Commissioner, (CCA-7), 158 Fed. (2d) 61. We have carefully considered all of the cases cited by petitioners and find them clearly distinguishable, and thus not dispositive of the issue presented. Petitioners next urge, particularly with reference *105 to the losses resulting from the sale of the Glaze and Coulter leases by Cherry, Kidd, & Sloan, that the same disposition is required as under the first major issue. They reason that since Kidd & Cherry developed, managed, and operated the properties, "any decision regarding the primary business of Kidd & Cherry must also carry over and determine the proper method of reporting" this loss. Petitioners would have us disregard the separate existence of the two partnerships, which we can not do. Internal Revenue Code, Section 187. Cf. Internal Revenue Code, Section 45. There are no circumstances presented which would justify the disregard of the Sloan partnership as a separate business unit. See Ross v. Commissioner, (CCA-5), 129 Fed. (2d) 310; Miles-Conley Co., 10 T.C. 754. And, moreover, it hardly lies with petitioners, who established the separate businesses and gained the advantage of such separateness, to urge a disregard solely for some possible tax advantage. See Romie C. Jacks, 19 B.T.A. 559. Beck-Brown Realty Co., 46 B.T.A. 1225. Cf. Higgins v. Smith, 308 U.S. 473. *106 But even if we were to disregard the separate identity of the Sloan partnership, petitioners could not prevail, for we would be required to consider the particular questioned transactions under the attending facts, and determine the nature of the properties sold in that light. Kanawha Valley Bank, supra. The facts show convincingly that Cherry, Kidd & Sloan, during its existence from 1940 until December 31, 1942, was engaged in the business of oil production. The only sales it ever made were of the Glaze and Coulter leases, which resulted in substantial loss. Petitioners themselves recognize that the facts lead to the conclusion which they have requested we find as a fact, and which we have found, that: "Cherry, Kidd & Sloan * * * at no time has held oil and/or gas leases or interests or royalties primarily for sale to customers in the ordinary course of the trade or business." Respondent's determination on the first issue is sustained in its entirety. The second and third issues arise over sales in the years before us by the individual petitioners of properties which they individually held. On the second issue, the burden of proof is upon petitioners, whereas *107 as to the third, the burden, as he recognizes, is respondent's. Rule 32, Rules of Practice Before The Tax Court. The problem we face has been resolved in other situations and by us under the first issue by application of the oft-used criteria - the frequency and continuity of dealings, Commissioner v. Boeing, (CCA-9), 106 Fed. (2d) 305; certiorari denied, 308 U.S. 619; the proximity of sales to purchases, Harriss v. Commissioner, supra 143 Fed. (2d) 279, the general history of the properties sold, including the method and purpose of acquisition, cf. Greene v. Commissioner, supra; and the general conduct of the operation, Ehrman v. Commissioner, (CCA-9), 120 Fed. (2d) 607; certiorari denied, 314 U.S. 668. Approached from these viewpoints, (the parties do not suggest others, nor do we think others to be material), the record will not support respondent's determination on either the second or third issue. We note, with reference to petitioner Kidd, that at all times material he was a licensed securities dealer; see Texas Civil Stas., Art. 600a. But this fact, although considered by us, does not loom too significantly *108 in view of the circumstances as explained in our findings. What impresses us are the facts that there is no course of conduct of sales by this petitioner, and as to the questioned sales, this petitioner did not even actively participate therein. Cf. Fahs v. Crawford, (CCA-5), 161 Fed. (2d) 315. There is no warrant in the record to support respondent's determination. See Carl G. Dreymann, 11 T.C. 153, (August 9, 1948). As to petitioner Cherry, the one sale which is in issue was made for the purpose of securing needed funds to reduce outstanding claims against him. Moreover, he acquired no interests during all the years 1939 through 1943, and the few sales made by him during those years were, for the most part, required in order to liquidate a former partnership. Three States Lumber Co. v. Commissioner, supra. On the second and third issues we decide in favor of petitioners. Decisions will be entered under Rule 50. Footnotes
1. Figures not given in record.↩
2. The partnerships of Cherry, Kidd & Lambert, and Cherry, Kidd & Sloan are hereinafter referred to and described. ↩
3. Selling expenses and the like have been deducted. ↩
4. Dry hole expenses are considered a production expense. They approximated $243,500 for the period. ↩
5. Does not include claimed long-term loss of Cherry, Kidd & Sloan. ↩
6. The sum of $115,000 realized upon the sale of an oil payment and reported under longterm capital gains is not considered either under sales or production income.↩
7. SEC. 117. CAPITAL GAINS AND LOSSES. (a) DEFINITIONS. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1) * * * (j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * *↩
8. Barron Kidd testified: "Each time we drilled a well we tried to sell a lease for an interest in a lease." He further testified as follows: Q. Did people who wanted to buy or sell oil leases or gas leases and so forth come to Kidd and Cherry's office there at Midland? A. Yes, they submitted us a lot of leases but on our geologic information we would have to send a broker out, and we often did to buy them. We had a man who worked for us and he would buy them. Q. Sometimes did Kidd and Cherry approach prospective buyers of oil leases? A. I would say so because when we were trying to drill a well we needed help. We would go to see them and try to get some help. Q. Sometimes the buyer would approach you? A. That is right. Q. Is it not true that Kidd and Cherry were always ready and willing to sell any leases if offered a price you considered good? A. No, that would be answered with qualifications. We were trying to get some production and we would sell a part in order to cut that gamble, yes. A. W. Cherry testified in response to a question as to why the leases were sold: "Those leases were sold for the purpose of spreading our risks * * *." ↩
9. In their opening brief, petitioners state: * * * Almost always Kidd & Cherry sold only a part interest in their oil properties, retaining usually a half interest in the hope that crude oil production might be obtained on the one-half interest retained. * * * By means of a sale, Kidd & Cherry obtained financial assistance to drill a well, or when a purchaser bought the properties with a contract on his part to develop the merit of the acreage retained by Kidd & Cherry would be proved or disproved. These sales were also a method of spreading the risk involved in obtaining crude oil production, * * *.↩