Carl G. Dreymann v. Commissioner.
Carl G. Dreymann v. Commissioner
Docket No. 22277.
United States Tax Court
1950 Tax Ct. Memo LEXIS 268; 9 T.C.M. (CCH) 132; T.C.M. (RIA) 50045; February 27, 1950
Sidney B. Gambill, Esq., for the petitioner. Louis A. Boxleitner, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner challenges respondent's determination of deficiencies in income tax of $11,782.41 and $12,316.33 for the years 1945 and 1946, respectively. Some of the adjustments are not contested, and respondent concedes error in the adjustment increasing petitioner's income by the amounts of $18,216.84 and $19,251.58 received by his daughter. The only remaining question is whether payments in these same amounts received in the taxable years by petitioner as proceeds from an invention are taxable to him as ordinary income or short-term capital gains, as alternatively contended by respondent, or as long-term capital gains as contended by petitioner. *269 Findings of Fact Petitioner filed his Federal income tax returns for the years in question with the collector of internal revenue at Pittsburgh, Pennsylvania. He was born in Germany in 1875, and settled in the United States in 1913 after having made two previous visits in 1906 and 1912 to study manufacturing. While engaged during the next five years at Baltimore, Maryland, in making certain products from fish oil, he devised and patented a process for using fish oil in the manufacture of steel. He permitted United States Steel Corporation to use the process free of charge during World War I, and thereafter he sold the patent for $3,000 to a former research director of the company who made the offer to purchase while petitioner was visiting in Europe. Petitioner developed no other inventions until he discovered the process for moisture-proofing paper herein involved. Between 1924 and 1930 petitioner operated a rayon factory at Utica, New York, and was employed as a consulting chemist in Chicago and as a consulting engineer in New York City. In 1930 he was employed at Mellon Institute, Pittsburgh, by a New York firm to test materials for the manufacture of shirt collars. At that *270 time Mellon Institute had a fellowship to encourage the development of a satisfactory moisture-proof paper for packages. Having been informed of the need for such packages, petitioner became interested in developing processes and materials with the purpose of eventually manufacturing them. During 1931 and 1932 he carried on his research in a laboratory in his home. In September, 1932, he was joined in the project by his daughter, Annie, to whom he agreed to give a one-half interest in any process produced by their efforts. They continued to work in the home laboratory, paying their living expenses from property inherited by Annie and from amounts borrowed by petitioner on his life insurance policies. Early in 1933 petitioner learned from an acquaintance that Grant Paper Box Co., hereinafter called Grant, had a factory in Pittsburgh. In April of that year he and Annie conferred with Grant's president who suggested that they carry on their research in a company laboratory. As of April, 1933, petitioner entered into a written contract with Grant under which he was to receive " $200 per month for period of two months" in consideration for his efforts to develop the moisture-proofing *271 material. The agreement further provided: "In the event that the second party [petitioner] is successful in developing anything new along the lines above set forth, then the first party [Grant] is to have the sole, exclusive right of manufacturing and selling the same in the United States and Canada and the first party agrees to pay the second party, five (5%) per cent of the gross sales. "The second party agrees to obtain patents upon such new ideas, if possible, the cost of said patents to be paid by the first party. "In the event that any patent applications are successful and that patents developed by the second party are issued to him, then the second party agrees to immediately assign, transfer and set over to the first party any and all such patents or patent rights. "In the event that the first party does not use within one year such patents so obtained, same will be turned back to the second party." At an undisclosed date between April 1, 1933, and August 30, 1933, petitioner and Annie were successful in developing the desired moisture-proofing process. On August 30, 1933, petitioner and Grant entered into a new agreement rescinding the former one and providing *272 that petitioner would apply for and assign to Grant United States and Canadian patents on the process. Grant agreed to pay petitioner at least $200 a month, including compensation for his services in further perfecting and developing the process and "royalties" of 5 per cent (one-half each to him and Annie) on the gross sales price of "all of the product marketed by it." Assignments and licenses of the patents were to be made only with petitioner's written consent, and his agreement upon the "royalties" fixed. Grant agreed to prosecute the manufacture and sale of "the product" with diligence, and if it became bankrupt or for other reason unable to continue manufacture, to "reassign forthwith all patents" to petitioner. The agreement was to remain effective "for the duration of the essential patents for the product, but in no event less than the period of ten (10) years * * *." On May 17, 1934, petitioner applied for a United States patent, the application stating: "This invention consists in a composition of matter having adhesive and water-proofing properties, and in the method of its production. * * *" On August 22, 1935, petitioner executed a written instrument reciting that *273 - "Whereas, I, Carl G. Dreymann, * * * have invented certain new and useful improvements * * * for which an application of Letters Patent of the United States was filed by me on the 17th day of May, A.D. 1934 * * *
"* * * for and in consideration of the sum of One Dollar * * * and other good and valuable considerations, I, the said Carl G. Dreymann, have sold, assigned, and transferred, and by these presents do sell, assign, and transfer unto the said Grant Paper Box Company the full and exclusive right, title and interest in and to the said invention * * *, and I do hereby authorize and request the Commissioner of Patents to issue such Letter Patents as shall be granted in pursuance of the above cited application to the said Grant Paper Box Company as the assignee of my entire right, title and interest in and to the same * * *." The patent was granted by the United States Patent Office on February 18, 1936. Petitioner and Grant twice supplemented their agreement of August 30, 1933. The first supplement, dated July 22, 1938, provided that Grant would exploit patents on the moisture-proofing process obtained by petitioner in France, Germany, and Great Britain, and divide *274 the proceeds equally between Grant, petitioner, and Annie. However, the foreign patents were never exploited, and they expired without action by either petitioner or Grant. The second supplement, dated January 20, 1939, stated to be for the purpose of making more specific provision for the licensing of the patents by Grant to other persons, fixed the royalties to be charged at not less than $5 per ton, to be received one-half by Grant and one-fourth each by petitioner and Annie. Both supplements providing that they did not interfere with nor in any manner abrogate the agreement of August 30, 1933, which "is to remain in full force and effect according to all of its terms and conditions." Neither supplement expressly referred to the instrument of August 22, 1935. The first of the "royalties" paid by Grant under the terms of the agreement of August 30, 1933, was received by petitioner and Annie during the latter part of 1936. Each of them received the following amounts during the years 1936 to 1946, inclusive: Year
Amount
1936
$ 522.06
1937
6,526.76
1938
6,948.67
1939
5,061.79
1940
5,730.60
1941
10,836.51
1942
16,279.59
1943
17,518.35
1944
18,078.57
1945
18,216.84
1946
19,251.58
*275 Of the totals for 1945 and 1946 the amounts received on account of Grant's own production and the amounts received on account of "sublicensing" by Grant were as follows: 1945
1946
On account of Grant's own
Production
$10,896.53
$11,015.92
On account of "sublicenses"
7,320.31
8,235.66
Total
$18,216.84
$19,251.58
Petitioner is the same person as the taxpayer involved in the proceeding of Carl G. Dreymann, 11 T.C. 153. In 1945 and 1946 petitioner conducted experiments in connection with his ideas for inventing a fluid motor, which he hoped to perfect and patent. Petitioner's return for the year 1945 contained, in the space provided for "Signature of person (other than taxpayer or agent) preparing return," the names "Lybrand, Ross Bros. & Montgomery." The return gave petitioner's occupation as "Inventor." In his returns for earlier years and for 1946, petitioner either gave his occupation as "Chemist" or left that space blank. From the commencement of his work upon the moisture-proofing process until the present time, petitioner's sole source of income has been the proceeds received from that process. In his returns for the years *276 1936 to 1946, inclusive, petitioner reported the above amounts as ordinary income. In his petition he states that the amounts so reported in 1945 and 1946 "* * * constituted proceeds from the sale of a capital asset held by petitioner for more than 6 months. Consequently, petitioner erroneously reported said amounts in his Federal income tax returns for said years as ordinary income, 100 per cent taxable. He should have reported said amounts as long-term capital gains taxable in accord with the provisions of Section 117 of the Internal Revenue Code." Opinion The identical transactions of the identical petitioner were before this Court in relation to his income tax liability for 1941 through 1944 in Carl G. Dreymann, 11 T.C. 153. All of the contentions now advanced by respondent were litigated, considered, and disposed of in the previous proceeding. The two following years, 1945 and 1946, are now before us, but they involve only collections in those years of payments under the same arrangements as those already thoroughly and exhaustively discussed in the earlier opinion. This proceeding might thus be governed by the doctrine of collateral *277 estoppel, the parties and the subject matter being the same and the only distinction that the liability involved is for a different year. See Tait v. Western Maryland Ry. Co., 289 U.S. 620. There is not even that change in the climate of legal thought which was found to justify a different result in Commissioner v. Sunnen, 333 U.S. 591. The theory of collateral estoppel being, however, a doctrine of repose designed largely for the practical purpose of eliminating recurring disputes, little would be gained by probing into the effect of that doctrine if the consequent controversy were to be as protracted and complicated as a decision of the proceeding itself on the merits. Cf. Anna Eliza Masterson, 1 T.C. 315, reversed (C.C.A., 5th Cir.), 141 Fed. (2d) 391. We accordingly refrain from consideration of the matter as res judicata and express no opinion on that subject. The basic facts being identical with those in Carl G. Dreymann, supra, necessarily made so by the introduction in evidence of the entire record in the prior case, [1] see Union Metal Manufacturing Co., 4 B.T.A. 287; cf. B. F. Edwards, 39 B.T.A. 735, *278 that proceeding is controlling here under the rule of stare decisis unless the cases are distinguishable on some legal ground. The only one advanced by respondent is that the Dreymann case was overruled as authority by Paul L. Kuzmick, 11 T.C. 288. With this we are unable to agree. The Kuzmick case was decided in the month following the Dreymann case, in a court-reviewed opinion without dissent, and does not in any respect purport to overrule it. The presumption that two cases decided by the same Court within so short a period would not be inconsistent unless expressly so described is, in this case, strengthened by the evident cognizance taken of the Dreymann opinion in the Kuzmick case, since it is there cited for comparison on a collateral question. There are many differences in the basic facts between the Kuzmick and Dreymann cases, but none between the Dreymann case and this proceeding. The result seems to us necessarily to follow that we are here governed by the Dreymann case and that the Kuzmick case *279 is not authority to the contrary and did not purport to announce a different rule of law. The contested issue is decided for petitioner on authority of Carl G. Dreymann, supra. To permit of uncontested adjustments, Decision will be entered under Rule 50. Footnotes
1. Such additional evidence of subsequent events as respondent urges to the contrary, we disregard as being to no extent inconsistent with the previous record.↩