Peter Kucera v. Commissioner.
Kucera v. Commissioner
Docket No. 27683.
United States Tax Court
1951 Tax Ct. Memo LEXIS 269; 10 T.C.M. (CCH) 303; T.C.M. (RIA) 51090; April 4, 1951
*269 Reuben Fingold, Esq., 700 Jones Law Bldg., Pittsburgh, Pa., for the petitioner. Edwin P. Friedberg, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $10,910.83 in income tax of the petitioner for 1947. The issue for decision is whether $31,250, which the petitioner received in 1947 as the result of an out-of-court settlement of a law suit, is ordinary income, capital gain, or a return of capital. Findings of Fact The petitioner filed his individual income tax return for 1947 with the collector of internal revenue for the twenty-third district of Pennsylvania. The petitioner came to the United States in 1909 and thereafter was employed for many years by various glass manufacturers in connection with the making of molds and models. He was never employed as an inventor. He applied for letters patent on about 21 inventions during the years 1920 through 1942, and was granted patents on a number of the applications. Most of the inventions were of no commercial value and he assigned his rights in them, with the exception of those here involved, to his employers without receiving compensation for *270 any transfer. The petitioner is the inventor of a glass gob feeding machine known as the Kucera Feeder, for which patent applications were first filed on November 19, 1931 and upon which letters patent were subsequently granted. The first idea of the feeder came to the petitioner in 1925 and it was developed prior to 1930. The petitioner entered into an agreement with Knox-O'Neill Company on August 10, 1931, and on August 11, 1931 entered into an agreement with McKee Glass Company. The two companies, described as licensees, agreed to divide the expenses of constructing and perfecting a Kucera Feeder. After it was commercially sound, Knox-O'Neill was to have an option on the exclusive right to manufacture and sell the feeder paying Kucera $500 for each feeder and guaranteeing him a minimum royalty of $6,000 a year for the duration of the patents, and McKee Glass Company was to have the right to use the feeder in making oven-baked glass. Knox-O'Neill recognized the feeder as commercially sound in February 1932, and on April 26, 1932 elected to exercise its option to have the exclusive right to sell the feeders. McKee Glass Company likewise exercised its option for exclusive use of *271 the feeder on oven-baked glassware. Each paid the petitioner $3,000 at the time the options were exercised. Thereafter, Knox-O'Neill manufactured and sold feeders until July 1932. It sold or contracted to sell 13 feeders during that period and had orders for more. Knox-O'Neill employed the petitioner from about April to July, 1932, at a salary of $25.00 per day to assist it in the sale and installation of the feeders and, as a result, the petitioner became known to some extent in the glass industry as a man familiar with, able to install, and able to instruct in the use of feeders. The industry had little interest in his ability in that field after he sold his feeder to Hartford-Empire Company on August 25, 1932. The Hartford-Empire Company (herein called Hartford) entered into negotiations with the petitioner in the summer of 1932 for the purchase of the invention of the Kucera Feeder. Hartford claimed that the feeder infringed its patents and threatened infringement suit unless the petitioner sold to Hartford. The petitioner asked $250,000 for the invention. Knox-O'Neill was unwilling to oppose Hartford. The petitioner and Knox-O'Neill cancelled their agreement on August 25, 1932 and *272 on that same day the petitioner entered into an agreement with Hartford whereby it agreed to pay Kucera $45,000 upon execution of the agreement and Kucera agreed to sell to Hartford his interest in the pending patent applications and the inventions embodied therein, subject to the contract with McKee Glass Company and the rights extended to Knox-O'Neill Company under the cancellation agreement. Hartford also agreed to pay Kucera $500 for each feeder licensed, leased or otherwise disposed of in the United States by Hartford prior to September 1, 1952, and guaranteed that it would pay a minimum of $8,000 per year for five years commencing September 1, 1932, the minimum to cover up to 16 feeders leased, licensed, or disposed of during each of those years. Kucera further agreed to transfer his interest in all inventions relating to the feeder made or acquired by him prior to September 1, 1937. Hartford agreed to pay Kucera $50 a day for his services in connection with work on the development or operation of the feeders. The contract did not include any foreign rights in the invention. Hartford paid Kucera $45,000 and the five payments of $8,000 each mentioned in the contract, a total *273 of $85,000, but never manufactured any of the feeders, never employed the petitioner, and never paid him any additional amount although the glass industry could have absorbed at least 333 Kucera Feeders over a period of years. The United States of America instituted an action against Hartford and others on December 11, 1939 charging violation of the Sherman Anti-Trust Act in unlawfully conspiring to restrain trade by maintaining monopolies on patents covering the manufacturing and licensing of glass-making machinery. A guilty holding was affirmed by the United States Supreme Court. The petitioner then filed suit against Hartford and others in a District Court of the United States. He stated in his complaint that he had invented the Kucera Feeder and had entered into license agreements with respect to it with Knox-O'Neill Company and McKee Glass Company, Knox-O'Neill had manufactured and sold some of the feeders, Hartford had then entered into negotiations for the purchase of the invention, Hartford had threatened infringement suits unless Kucera sold his patent rights to Hartford, and he had agreed to sell, provided he could be released from his contracts with Knox-O'Neill and *274 McKee, Hartford would drop the threatened infringement litigation and allow Knox-O'Neill to complete its existing contracts to sell the feeders, and Hartford would market the feeder and not "shelve" it. He alleged that after he cancelled the Knox-O'Neill contract Hartford entered into a secret agreement with Knox-O'Neill under which Knox-O'Neill received certain advantages, Hartford threatened patent litigation against all who had bought the Kucera Feeders, Hartford never built any of the feeders and discouraged use of the feeders, Hartford had paid the petitioner $45,000 upon signing the agreement of August 25, 1932, and thereafter the guaranteed minimum royalty of $8,000 per year for five years, but it never paid other royalties. He also alleged that Hartford and others were in an unlawful combination and conspiracy in restraint of trade and Hartford's purchase of the Kucera Feeder was in furtherance of the conspiracy in that the feeder was removed from the market. Reference was then made to the holding that Hartford and others had violated the antitrust laws. He alleged that the president of Hartford had said that Hartford would place the Kucera Feeder on the market commercially, *275 whereas it purchased it merely to remove it from the market and eliminate competition. The allegations of the complaint with regard to injury suffered by Kucera, and the prayer, were as follows: "By virtue and as a result of the aforesaid unlawful conspiracy, monopoly and combination in restraint of trade, and the acts, conduct and omissions of the defendants pursuant thereto, plaintiff has suffered substantial injury and damage in that plaintiff has been deprived of the benefits and profits of the contract with Knox-O'Neill hereinbefore referred to in paragraphs 13 and 14, which contract defendant Hartford, acting pursuant to the aforesaid unlawful conspiracy, monopoly and combination, caused plaintiff to cancel, and in that plaintiff has been deprived of the royalties and other benefits which he would have derived from his contract with defendant Hartford, hereinbefore referred to in paragraphs 19 and 20, had said defendant in good faith marketed the Kucera feeder commercially instead of suppressing and discouraging its use, and failing, refraining and refusing to build, license, lease, sell or offer for sale such feeder, pursuant to the aforesaid unlawful conspiracy, monopoly *276 and combination, and plaintiff has otherwise been injured in his business and property, all to his damage in the sum of Five hundred thousand ($500,000.) dollars. "WHEREFORE, the plaintiff prays judgment in the sum of Five hundred thousand ($500,000.) dollars as actual damages sustained, and that said damages be trebled in accordance with the provisions of the aforesaid Anti-Trust Acts, together with the costs and disbursements of this action, including reasonable counsel fees as provided by law." The petitioner, after filing the suit against Hartford, entered into a written settlement agreement whereby Hartford paid him $75,000 in settlement of all claims connected with the action in the District Court or the agreement of August 25, 1932. The petitioner realized the net amount of $31,250 from the settlement. He reported $10,416.67, one-third of the total net settlement, as income for 1947. The Commissioner, in determining the deficiency, held that the entire amount of $31,250 received in the settlement was income for 1947 and that it could not properly be reported under section 107(b) of the Internal Revenue Code. The stipulation of facts filed by the *277 parties is incorporated herein by this reference. Opinion MURDOCK, Judge: The petitioner, relying heavily upon Farmers and Merchants Bank of Catlettsburg, Kentucky v. Commissioner, 59 Fed. (2d) 912, contends that the payment which he received in the settlement is not income but a return of capital because it represents compensation for his good will destroyed by Hartford. The evidence does not bear out this contention of the petitioner but shows, on the contrary, that he sold the United States rights to his invention to Hartford and the settlement was to compensate him for the additional profit which he would have had from his invention but for the illegal actions of Hartford. The petitioner was not at all widely known in the glass industry prior to the spring of 1932, after a feeder had been actually built and made commercially sound. Then, for a short time, his reputation in the industry as a feeder expert grew but it ceased to grow and was soon forgotten after the industry learned he had sold out to Hartford. The record does not justify any finding as to the worth of his reputation as a feeder expert in dollars. He made no claim for loss of good will. Hartford *278 apparently bullied Knox-O'Neill into cancelling its contract and forced the petitioner to sell the domestic rights to his invention to Hartford. There is no indication, however, that the contract between Hartford and the petitioner was not a fair one if Hartford, as the petitioner expected, had made a genuine effort to have the Kucera Feeder used in the industry to the extent that its merits would have resulted in its use in a fair market. Indeed, the contract with Hartford was a better contract than the one with Knox-O'Neill. Hartford deliberately prevented the use of the feeder instead of encouraging its use as it should have if it had acted in good faith. The petitioner thought he might eventually receive as much as $500,000; that is, $500 on each of 1,000 feeders, but he was willing to sell to Hartford for a lump sum of $250,000. He apparently received about $12,500 from McKee and Knox-O'Neill. He then received $85,000 from Hartford and finally $75,000 in the settlement, a total of about $172,500. Thus, he never received nearly as much as he thought his invention was worth. This record does not justify allocating any of the settlement payment to loss of good will or to anything *279 other than payment for the invention. The next question is whether the 1947 payment, all of which represents income, is to be taxed in its entirety as ordinary income or only taxed to the extent of 50 per cent because it was a capital gain. It is not disputed that the petitioner owned the invention for more than two years prior to the sale to Hartford and the question turns upon whether that invention was a capital asset in his hands. The Commissioner argues that the petitioner was an inventor who was regularly engaged in the business of selling his inventions to customers and this invention was property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. The petitioner invented a number of different things but the invention which he sold to Hartford was the only one which was commercially sound, was the only one which he ever sold and was the only one for which he received compensation of any kind. The petitioner was never employed as an inventor, he never set himself up as a seller of inventions but was, at least until 1932, a mere worker in the glass industry making molds and models. His inventions were apparently a hobby and one *280 of them turned out to be valuable, but this one isolated instance does not establish a business. Bessie B. Hopkinson, 42 B.T.A. 580, affirmed 126 Fed. (2d) 406; Edward C. Myers, 6 T.C. 258; Carl G. Dreyman, 11 T.C. 153. The invention was a capital asset when sold. Decision will be entered under Rule 50.