Arthur C. Cope and Bernice A. Cope v. Commissioner.
Cope v. Commissioner
Docket No. 34292.
United States Tax Court
1953 Tax Ct. Memo LEXIS 254; 12 T.C.M. (CCH) 525; T.C.M. (RIA) 53168; May 15, 1953
*254 Petitioner Arthur C. Cope, a professor of chemistry, reduced to practice an invention in the field of barbituric acids in August 1932 and later sold the invention on September 17, 1936. 1. Held, the contract of sale entered into on September 17, 1936, was not a contract for the personal services of Arthur C. Cope. 2. Held, on the facts, the invention sold by Arthur C. Cope was not property held by that petitioner primarily for sale to customers in the ordinary course of his business. 3. Held, on the facts, petitioner Arthur C. Cope had reduced his invention to practice by August 1932. John F. Cremens, Esq., for the petitioners. Joseph Landis, Esq., and Nathan Silverstein, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the income tax of the petitioners as follows: 1947
$1,460.83
1948
1,709.78
1949
5,670.84
The issue presented for our decision is whether certain amounts paid to petitioner Arthur C. Cope by Sharp & Dohme, Inc. in 1947, 1948 and 1949, as a percentage of sales of a patented product were ordinary income or gain from the sale of a capital asset held by *255 Arthur C. Cope for more than six months. Findings of Fact A part of the facts are stipulated embodying therein certain exhibits, which are included herein by reference and made a part of our findings of fact. Petitioners, husband and wife, filed their joint returns for the years here involved with the collector of internal revenue for the district of Massachusetts. Arthur C. Cope, hereinafter referred to as the petitioner, is a professor of organic chemistry. He received his degree of Doctor of Philosophy from the University of Wisconsin in 1932. From 1932 to 1934 the petitioner held a National Research Council Fellowship at Harvard University, and from 1934 to 1941 he taught chemistry at Bryn Mawr College. The petitioner was an associate professor of chemistry at Columbia University from 1941 to 1944 but was on leave of absence during part of this time in the employment of the Office of Scientific Research. Since 1945 petitioner has been the head of the department of chemistry at Massachusetts Institute of Technology. In addition to the many honors which the petitioner has won in his field, he has been a member of the editorial boards of several publications prominent *256 in the field of chemistry and has held various offices in the leading chemical societies. The petitioner has also written approximately 100 papers recording results of research in the field of organic chemistry. The petitioner's work as a professor consists of spending a full day teaching and advising graduate students, lecturing, consulting with research students and associates on the pure research work being done at the university or institute where he teaches. He spends a considerable amount of time in writing and reading chemical literature and serving as advisor on problems of fellowships and other matters brought to him by Government agencies and research foundations. A few days a year, as is common for professors of some standing in the field of chemistry, the petitioner works as a consultant for the Government and corporations, such as E. I. du Pont de Nemours, Inc., Sharp & Dohme, Inc., and J. T. Baker Chemical Company, but under conditions where any inventions or contribution to an invention he might make would belong to the Government or to the corporation for which he was working. In addition to the sums here in controversy, Sharp & Dohme, Inc., hereinafter referred *257 to as the Company, paid the petitioner a retainer as a consultant which is reported by the petitioner on his income tax returns as ordinary income. In May 1932, after the petitioner had finished his doctoral dissertation, he stayed at the University of Wisconsin to do research work in the field of barbituric acid derivatives. He continued to work in this field through August 1932 and during the process of the research conducted from May through August 1932 the petitioner invented, or synthesized, a new class of barbituric acids, defined as a class of substituted vinyl alkyl barbituric acids or a five delta one alkenyl barbituric acid or a five delta one alkenyl alkyl barbituric acid. This invention of the petitioner consisted of preparing barbituric acids with an alkyl group in the five positions which had a double bond on the delta one carbon atom. The petitioner reduced his invention to practice in August 1932. His research notes of the period May through August 1932 set forth the invention in sufficient detail to enable a chemist skilled in the art to produce barbituric acids of the class and improvements thereon without further application of an inventive act. No one, prior to *258 the petitioner's research in 1932, had been able to produce barbituric acids with an alkyl group in the five positions which had a double bond on the delta one carbon atom where such a group was open chain or aliphatic in character. After 1932 petitioner did nothing further concerning his invention until late 1935 or early 1936, when he was contacted by Dr. Walter H. Hartung, a chemist employed by the Company, who had learned of the petitioner's research in the barbituric acid field from one of the petitioner's professors at the University of Wisconsin. The Company expressed an interest in the petitioner's invention and from May 18 to September 17, 1936, the petitioner was employed by the Company at a salary of $50 a week to produce compounds necessary for testing the new class of barbituric acids invented by him. During this period the petitioner had discussions with Hartung and Dr. Frank Crossley, another employee of the Company, with reference to the synthesis of the new barbituric acids invented by the petitioner. On September 17, 1936, the petitioner entered into an agreement with the Company, which in so far as is here pertinent is set out below: "Memorandum of agreement *259 made and entered into as of the 18th day of May, 1936, by and between ARTHUR C. COPE, of Bryn Mawr, Pennsylvania, hereinafter referred to as COPE, and SHARP & DOHME, Incorporated, a Maryland corporation (incorporated in 1929), of Philadelphia, Pennsylvania, hereinafter referred to as SHARP & DOHME, "WITNESSETH: "WHEREAS, both parties have been conducting research work relating to the production of alkylidene malonic esters and cyanoacetic esters, alkenyl malonic esters and cyanoacetic esters, and corresponding and related barbituric acids and thiobarbituric acids, and have made certain inventions relating thereto, as follows: "A. COPE has invented a process for the alkylation of primary and secondary alkylidene malonic esters and primary alkylidene cyanoacetic esters by the use of metallic sodium in an inert solvent. "B. COPE has invented a process for the production of alkyl alkenyl malonic esters from the condensation products of ketones and malonic esters in which the alkyl group may be higher than the methyl group, and in which alkyl halides other than methyl iodide may be used. "C. COPE has invented a process for the production of alkylidene malonic esters and cyanoacetic *260 esters by the condensation of ketones or aldehydes with cyanoacetic ester or malonic ester in the presence of piperidene acetate, or other substituted alkyl ammonium salts, ammonium salts, or metallic salts. "D. COPE has invented, jointly with Walter H. Hartung & FRANK S. CROSSLEY of the chemical laboratories of SHARP & DOHME, a process for the production of alkyl alkenyl cyanoacetic esters by the alkylation of alkylidene cyanoacetic esters. "E. COPE has invented, jointly with WALTER H. HARTUNG and FRANK S. CROSSLEY of the chemical laboratories of SHARP & DOHME a process for the production of alkyl malonic esters and cyanoacetic esters by the hydrogenation of the corresponding alkylidene malonic esters and cyanoacetic esters. "F. WALTER H. HARTUNG and FRANK S. CROSSLEY of the chemical laboratories of SHARP & DOHME have invented a process for the production of alkenyl alkyl malonic esters by the alkylation of corresponding alkylidene malonic esters produced by the condensation of aldehydes with malonic ester. "G. COPE and WALTER H. HARTUNG and FRANK S. CROSSLEY of the chemical laboratories of SHARP & DOHME have separately and jointly invented certain new products, produced by *261 one or more of the processes referred to in paragraphs A through F of this outline; "WHEREAS, it is the desire of both parties that SHARP & DOHME undertake in cooperation with COPE the further investigation, improvement, development, promotion, and exploitation of the processes referred to above, as well as of any products or other processes relating thereto which have heretofore been invented or discovered or which may hereafter be invented or discovered by COPE, by one or more members of the staff of SHARP & DOHME, or by COPE AND ONE OR MORE MEMBERS of the staff of SHARP & DOHME jointly, and that COPE be enabled to continue his investigation in this field; "WHEREAS, SHARP & DOHME desires to obtain the right to manufacture and sell any substances under the foregoing outline which may prove of therapeutic merit, and to use one or more of the processes under the foregoing outline which may prove of value to it, and may desire to use the alkylidene or alkyl alkenyl malonic esters or alkylidene or alkyl alkenyl cyanoacetic esters as intermediates in further syntheses: "NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinafter set forth, and other *262 good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows: 1. COPE agrees to grant and does hereby grant to SHARP & DOHME the sole and exclusive right to manufacture and sell in the United States of America and all foreign countries any and all of the substances within the scope of the foregoing outline which may be new products, and to use and carry out any and all processes within the scope of the said outline, which have heretofore been developed or which may be developed during the period beginning May 18, 1936, to and including September 19, 1936, which in the opinion of SHARP & DOHME have sufficient merit to be worthy of further development and exploitation. "2. COPE agrees to execute applications for Letters Patent of the United States or any foreign countries, either sole or joint as the case may be, for such of said substances and processes as SHARP & DOHME may decide are worth patenting and exploiting, and to assign such applications and the inventions covered thereby to SHARP & DOHME, but all at the expense of SHARP & DOHME; but SHARP & DOHME reserves the right to discontinue the prosecution of any such application *263 or applications, provided that in such event, it shall assign such application or applications to COPE, who shall have the right to continue such prosecution for himself or others, and SHARP & DOHME agrees to give COPE reasonable notice of its intention to discontinue the prosecution of any such application or applications, to allow COPE to continue the prosecution thereof. "3. COPE agrees that SHARP & DOHME shall have an option to acquire the exclusive right to any substances or processes which he may develop after the period mentioned in paragraph 1 herein in the field defined in the foregoing outline, including such improvements as may be made in the processes defined, or new products which may be invented, for the same royalty as hereinafter provided in this agreement. "4. SHARP & DOHME agrees to pay COPE the sum of Fifty Dollars ($50.00) per week for the period beginning May 18, 1936 to and including September 19, 1936, and further agrees to supply COPE during that period, free of cost, such chemicals as may be needed by him in carrying on the work of development. "5. SHARP & DOHME agrees that as soon as it is satisfied that it is warranted in going ahead with the commercial *264 exploitation of any of the substances hereinbefore mentioned, it will proceed to the manufacture and sale of such substances and will exercise such proper diligence in exploiting them and creating, developing, and supplying a market therefor, as SHARP & DOHME, in its judgment, deems warranted by the character and salability of the products and the market conditions existing from time to time. "6. SHARP & DOHME agrees to pay to COPE a royalty of two and one-half percent (2 1/2%) of the sales price of any of the 5, 5-dialkyl barbituric acids, 5-alkylidene barbituric acids, 5, 5-dialkyl thiobarbituric acids, 5-alkylidene thiobarbituric acids, or other alkyl barbituric acids or thiobarbituric acids, or their salts, whether substituted in other positions or not, which may be developed and exploited under this agreement and sold in the continental United States, calculated upon the lowest price at which such substance or substances are sold and billed by SHARP & DOHME to that class of its customers known as 'Distributing Jobbers'; and a royalty of two and one-half percent (2 1/2%) of the cost of any alkylidene or alkyl alkenyl malonic esters or alkylidene or alkyl alkenyl cyanoacetic esters *265 produced in accordance with the novel processes outlined above, or any modifications or improvements thereof, used as intermediates by SHARP & DOHME in the manufacture of products other than the barbituric acids or thiobarbituric acids above mentioned. "7. It is understood and agreed that should SHARP & DOHME deem it advisable to manufacture any pharmaceutical preparations or mixtures containing any of the substances covered by this agreement as a constituent part and offer the same for use to the medical profession or for any other purpose, the amount of royalty to be paid thereon shall be at the rate of two and one-half percent (2 1/2%) of the lowest sales price referred to in paragraph 6 hereof, calculated upon the amount of such substances or substances employed in the making of such preparations or mixtures, the same as if such substance or substances had been separately sold in the original form, and not upon the sales price of the preparation or mixture in which such substance or substances entered; but if none of the substances used in the pharmaceutical preparations or mixtures are sold as such in their original form, the royalty payable under this paragraph shall be two *266 and one-half percent (2 1/2%) of an adjusted sales price, obtained by multiplying the sales price of the pharmaceutical preparation or mixture (as in paragraph numbered 6 above) by the ratio of the cost of the ingredients in such pharmaceutical preparation or mixture covered by this agreement as a constituent part and the total cost of all the ingredients of the pharmaceutical preparation or mixture. "8. SHARP & DOHME agrees to pay COPE a royalty on products covered by this agreement and sold outside of the continental United States, the royalty to be computed on a basis such that it bears the same relation to the net profit which SHARP & DOHME makes on such products as the two and one-half percent (2 1/2%) royalty on products manufactured and sold in continental United States bears to the net profits which SHARP & DOHME makes on such products." * * * Although the agreement was dated May 18, 1936, it was in fact entered into and executed by the parties on September 17, 1936. The petitioner was not represented independently by counsel during the negotiations in 1936 leading up to the agreement set out above, nor was the petitioner represented by counsel concerning the applications *267 for patents issued with respect to his invention. The patent applications, the terms of the patents and the names of the individuals to whom the patents were issued were determined by the Company's patent attorneys. Beginning October 15, 1936, the petitioner individually and jointly with Hartung and Crossley applied for patents on the invention of petitioner as provided in the agreement of September 17, 1936. The petitioner's invention was covered by the broad or generic patent, No. 2,187,701. Chemically all of the United States patents in the field of barbituric acids set forth below are covered by the broad or generic patent and the inventions covered in each of the protective patents are embodied in one general invention covered by patent No. 2,187,701: Patent
Date of
Date of
Issue
Number
Assignment
Application
Date
2,119,526
10/ 9/36
10/15/36
6/ 7/38 *
2,176,018
10/ 9/36
10/15/36
10/10/39 *
2,187,701
10/ 9/36
10/15/36
1/16/40
2,188,874
10/14/36
10/15/36
1/30/40
2,222,455
10/14/36
10/15/36
11/19/40
2,150,154
6/15/37
6/19/37 **
3/14/39
2,187,702
3/10/39
3/14/39
1/16/40
2,187,703
3/20/39
3/23/39
1/16/40
2,219,543
12/16/39
12/20/39
10/29/40
*268 The chemical relationship of the nine United States patent in the field of barituric acids is as follows: Patent
2,119,526
covers the preparation of an inter-
mediate from the intermediate cov-
ered by U.S. Patent 2,150,154 and
is the intermediate just prior to the
barbituric acids.
2,150,154
covers the first intermediate on the
way to a barbituric acid covered by
the generic patent, U.S. Patent
2,187,701.
2,176,018
covers a test made to prove the
nature of the intermediate in the
process covered by U.S. Patent
2,150,154.
2,187,701
is a generic patent covering the new
class of barbituric acid derivatives
which have a double bond in the
delta one position of one of the
alkyl groups in the five position of
the barbituric acids.
2,187,702
describes barbituric acids of the
same type covered by U.S. Patent
2,187,701 but with a minor structural
modification which consists of the
presence of an alkyl group on one
of the nitrogen atoms. This is a
narrower patent within the scope of
the broad patent.
2,187,703
is a patent of narrower scope than
U.S. Patent 2,187,701 and restricts
the field to a narrower group of
compounds in the same class.
2,188,874
covers a way of making intermediates
leading to the same type of barbi-
turic acids as those described in
U.S. Patent 2,187,701.
2,219,543
covers a structural modification of
the barbituric acids consisting in hav-
ing a sulphur atom in place of
oxygen attached to carbon number 2.
This is a patent of narrower scope
than U.S. Patent 2,187,701 but is
included within the broad invention
of U.S. Patent 2,187,701.
2,222,455
covers a process of making inter-
mediates leading to the same class of
barbituric acids covered by U.S.
Patent 2,187,701.
*269 The periodic payments here in question are made primarily on account of one product, "Delvinal", produced under patents 2,150,154, 2,119,526, 2,187,701 and 2,187,703. The periodic payments made are broken down as follows: Royalties from
Patent No.
From
Year
Total
2,176,018
Delvinal
1947
$ 6,366.58
$302.82
$ 6,063.76
1948
10,574.97
128.22
10,446.75
1949
26,163.37
37.68
26,125.69
From the period September 17, 1936, through October 4, 1940, the Company supplied the petitioner with certain chemicals and paid to the educational institution at which he taught during the period a research grant to cover the cost of hiring a research assistant to aid the petitioner in certain of his research. On October 4, 1940, the petitioner and the Company entered into an agreement referred to as the major agreement, which provided, among other things, that the Company would provide a research assistant to aid petitioner and chemicals for his use and that the petitioner agreed to direct and supervise the work of the research assistant and to devote his time in research work, other than that required in his academic employment, in the field of pharmaceutics *270 and pharmacodynamics for the exclusive benefit of the Company. On the same date the petitioner and the Company entered into an agreement, referred to as the first supplemental agreement, that the Company should pay to the petitioner royalties on any product or preparation embraced in the original agreement made September 17, 1936, in the major agreement made October 4, 1940, or in the first supplemental agreement as provided in the latter. On July 7, 1941, the petitioner and the Company entered into a further agreement, referred to as the second supplemental agreement, by which it was agreed that the Company should pay royalties to the petitioner on any product or preparation embraced by the original agreement, the major agreement, the first supplemental agreement or by the second supplemental agreement as provided therein. The relations of the petitioner and the Company were further modified by a third supplemental agreement dated October 10, 1946. In addition to the patents listed above, the petitioner has assigned the following patents to the Company: Patent
Date of
Number
Assignment
2,339,914
1/28/41
2,442,721
12/20/43
2,442,797
12/20/43
2,456,555
10/ 3/45
2,456,556
10/ 3/45
2,459,217
12/20/43
2,486,374
1/13/47
2,486,375
12/16/46
2,497,394
12/18/46
*271 The above mentioned patents covered a general invention in the field of local anesthetics. The petitioner has never received any sums from the Company attributed to these patents. The agreement entered into between the petitioner and the Company on September 17, 1936, was intended to and did effect the sale of the petitioner's invention. The petitioner's invention was not property held by him primarily for sale to customers in the ordinary course of his business. The petitioner had reduced the invention, subject of the sale on September 17, 1936, to practice by august 1932. Since October 4, 1940, the petitioner has engaged in chemical research and developmental work in the pharmaceutical and the pharmacodynamical fields for the exclusive benefit of the Company. Opinion HILL, Judge: The respondent advances three arguments in opposition to the position taken by the petitioner herein: (1) that the periodic payments here in question were paid to the petitioner as compensation for services in the invention and development of Delvinal; (2) if the amounts in issue were paid to the petitioner for property sold by him, the gain is ordinary income because the property was held by the *272 petitioner primarily for sale to customers in the ordinary course of his business; and (3) if the payments were made as part of the purchase price of the capital asset, the amounts received by the petitioner were taxable at ordinary rates because the capital asset had not been held for more than six months prior to its sale by the petitioner. We shall deal with the arguments of the respondent in the order presented. We agree with the respondent that the issue presented by the facts of this case turns on the interpretation of the contract entered into between the petitioner and the Company on September 17, 1936. The respondent contends that this contract was one for the services of petitioner in inventing and developing new processes and products in the field of barbituric acids. The respondent bases his argument on this point on the following language found in the original agreement entered into by the parties on September 17, 1936: "WHEREAS, it is the desire of both parties that SHARP & DOHME undertake in cooperation with COPE the further investigation, improvement, development, promotion, and exploitation of the processes referred to above, as well as of any products or other *273 processes relating thereto which have heretofore been invented or discovered or which may hereafter be invented or discovered by COPE, by one or more members of the staff of SHARP & DOHME, or by COPE AND ONE OR MORE MEMBERS of the staff of SHARP & DOHME jointly, and that COPE be enabled to continue his investigation in this field; * * *
"4. SHARP & DOHME agrees to pay COPE the sum of Fifty Dollars ($50.00) per week for the period beginning May 18, 1936 to and including September 19, 1936, and further agrees to supply COPE during that period, free of cost, such chemicals as may be needed by him in carrying on the work of development. * * *
6. SHARP & DOHME agrees to pay COPE a royalty of two and one-half percent (2 1/2%) of the sales price of any of the 5, 5-dialkyl barbituric acids, 5-alkylidene barbituric acids, 5, 5-dialkyl thiobarbituric acids, 5-alkylidene thiobarbituric acids, and other alkyl barbituric acids or thiobarbituric acids, or their salts, whether substituted in other positions or not, which may be developed and exploited under this agreement and sold in the continental United States, * * *." However, the respondent overlooks the fact that the petitioner *274 had so reduced his invention to practice in 1932 as to enable any chemist conversant with the art and trained to a fairly high degree of skill to make any of the compounds covered in the series of patents relating to barbituric acids, set forth in our findings of fact, and many more, once the petitioner's invention had been revealed. The petitioner had accomplished what the Company's chemists had not been able to produce in their research. Thus, once the invention had been revealed to the Company, either Hartung or Crossley had the skill necessary for any further development of the petitioner's invention which the Company felt was required. This fact tends to negative the interpretation of the sale agreement for which the respondent argues. Further, the services rendered by the petitioner during the period May 18, 1936, to September 17, 1936, were paid for at the rate of $50 per week by the Company. These services involved preparing barbituric acid compounds of the type covered by the petitioner's invention for the purpose of animal tests to be conducted by the Company. It is true that during this period the petitioner had discussions with Crossley and Hartung. This was natural. *275 It can not be assumed that the Company was interested in purchasing an asset without wishing to know as much as possible about that which it was buying. The respondent also points to the fact that two of the patents were applied for and issued jointly in the names of the petitioner, Hartung and Crossley, and argues that this fact supports his contention that the contract of September 17, 1936, was one for the personal services of the petitioner. The two patents issued in the joint names of the petitioner, Hartung and Crossley, patents 2,119,526 and 2,176,018, covered the preparation of an intermediate compound and a process for the purpose of testing the intermediate. Both were narrow protective patents leading to the process covered by the broad generic patent 2,187,701, which covered the new class of barbituric acids invented by the petitioner. The broad generic patent was applied for and issued in the petitioner's name alone. He was the sole inventor of the new class of barbituric acids. The fact that the Company's patent attorneys decided that the two narrow patents should be applied for in the joint names of the three carries little persuasive weight when it is remembered that *276 the petitioner was not represented in the negotiations by independent counsel. We think it is clear that the agreement entered into by the petitioner and the Company on September 17, 1936, was intended to and did effect a sale of the petitioner's invention, and we so hold. By his second argument the respondent contends that the periodic payments here in question are not entitled to capital gains treatment because the property sold by the petitioner was held by him primarily for sale to customers in the ordinary course of his business. The circumstances leading up to the sale do not support the respondent's contention. After reducing his invention to practice in 1932, the petitioner did nothing further concerning it until he was approached by Hartung on behalf of the Company in 1936. The petitioner made no attempt to sell his invention or advertise his discovery. He had no discussions with anyone with respect to the sale of it. During the period he was engaged in his profession of teaching chemistry and conducting pure research work on an academic level. The petitioner during the period 1932 through 1936 was not in the business, even incidentally, of inventing, nor did he conduct *277 any business during this period independent of his teaching. The respondent supports his position by pointing to the number of patents assigned by the petitioner to the Company during the period October 9, 1936, to January 13, 1947, or 18 in number. However, these patents cover but two broad inventions, only one of which concerns us here. Further, the number of patents applied for was determined by the patent attorneys of the Company and both of the inventions of the petitioner are covered by one broad generic patent and several allied protective patents. Therefore, it can hardly be said that the frequency and continuity of patent assignments made by the petitioner compel a holding that the invention here in question was held primarily for sale to customers in the ordinary course of the petitioner's business, nor do the facts and circumstances surrounding the sale support the proposition. The case of Harold T. Avery, 47 B.T.A. 538, on which the respondent relies, is not in point. The facts on which that decision was rendered are clearly distiguishable from those present here. We, therefore, hold that the petitioner's invention was not property held primarily for sale by *278 him in the ordinary course of his business. Carl G. Dreymann, 11 T.C. 153. By the third argument the respondent contends that the petitioner's invention was not held by him for more than six months prior to its sale and that the gain on the sale is not long-term capital gain. The holding period for the petitioner's invention began on the date on which it was reduced to practice. By August 1932 the petitioner had completed his invention. This fact is evidenced by his research notes made during the period from May 1932 through August 1932. Thus, the petitioner had available in August 1932 the operative means by which another skilled in the art of chemistry could produce the barbituric acids covered by the patents set forth in our findings of fact and many more. Edward C. Myers, 6 T.C. 258. The petitioner contends, and we must agree, that it is immaterial whether the actual sale is construed to have taken place on May 18, 1936, September 17, 1936, or the date on which the first patent was assigned by the petitioner to the Company, October 9, 1936, for the sale in no event took place earlier than May 18, 1936. In any event the petitioner held his invention, *279 which had been reduced to practice, for more than six months or more than 24 months and is entitled to have the gain from the sale of his asset taxed at long-term capital gains rates. After considering the evidence as a whole, we are convinced that the petitioner sold on September 17, 1936, his invention in the field of barbituric acids, which had been reduced to practice by him in August 1932. Decision will be entered for the petitioners. Footnotes
*. Applied for and issued jointly in the names of Cope, Hartung, and Crossley. ↩
**. This is a continuation, in part, of an application filed October 15, 1936.↩