FINN H. MAGNUS AND ELSIE A. MAGNUS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57258. Filed July 29, 1957.

*Andrew T. Gill, Esq.,* and *John A. Conlin, C. P. A.,* for the petitioners.

*Stanley W. Herzfeld, Esq.,* for the respondent.

MULRONEY, *Judge:* Respondent determined a deficiency in the petitioners' Federal income tax for the year 1951 in the amount of $14,387.40. The issues presented are whether royalties in the amounts of $11,437.22 and $18,638.76 received by the petitioners in 1951 were taxable as ordinary income or as long-term capital gain.

FINDINGS OF FACT.

Some of the facts were stipulated and they are herein included by this reference.

Finn H. Magnus and Elsie A. Magnus, husband and wife, are residents of Essex Falls, New Jersey. They filed a joint income tax return for the year 1951 with the then collector of internal revenue at Newark, New Jersey. Finn H. Magnus will hereinafter be referred to as the petitioner.

Petitioner developed certain inventions pertaining to the construction of plastic reed plates and plastic reeds for harmonicas, and he filed applications for letters patent over a period from June 18, 1942, to March 17, 1944. There were issued by the United States Patent Office the following patents on applications originally made by the petitioner:

| Patent issued | Date | Issued in name of |
|---|---|---|
| 2,384,758 | Subsequent to Feb. 27, 1945. | International Plastic Harmonica Corporation. |
| 2,373,129 | Apr. 10, 1945 | Finn H. Magnus. |
| 2,407,312 | Sept. 10, 1946 | International Plastic Harmonica Corporation. |
| 2,416,451 | Feb. 25, 1947 | International Plastic Harmonica Corporation. |
| 2,348,830 | May 16, 1944 | Finn H. Magnus. |
| 2,340,333 | Feb. 1, 1944 | Finn H. Magnus. |
| 2,339,790 | Jan. 25, 1944 | Finn H. Magnus. |

On January 15, 1944, the petitioner granted an exclusive license to Harmonic Reed Corporation, hereinafter called Harmonic, to manufacture harmonicas in North and South America under petitioner's patents. Harmonic was obligated to pay a royalty of 1 cent for each harmonica sold. The agreement provided for petitioner's employment by Harmonic for 2 years and for additional 1-year periods unless the employment was canceled by either party on 90 days' notice. The agreement also contained the following provisions with respect to its termination:

9. This agreement shall remain in effect for a period of two (2) years from February 1, 1944, and in the event that neither party gives the other three (3) months prior notice in writing of a desire to terminate same, this agreement shall thereafter continue in full force and effect and upon the same terms and conditions for an additional period of one (1) year and so on from year to year unless either party gives the other three months prior written notice terminating this agreement at the end of any extended yearly period.

(a) Should [petitioner] give notice of terminating the working agreement provided herein, the salary paid to [petitioner] shall cease at the end of said yearly term, or on the date that [petitioner] ceases to serve [Harmonic], but the exclusive license to use the patents shall remain vested in [Harmonic], so long as [Harmonic] pays to [petitioner] the royalties provided herein.

(b) Should [Harmonic] give such a notice to [petitioner] terminating this agreement, the salary of said [petitioner] shall cease on the expiration of the yearly term, the exclusive license to use the patents mentioned in the paragraph numbered 2 of this agreement shall terminate and be void, and [Harmonic] hereby agrees to execute such assignments or other papers as [petitioner] may deem necessary to evidence the termination of said exclusive license. [Petitioner] grants to [Harmonic] the right to dispose of all harmonicas actually on hand at the time of such termination by [Harmonic], and [Harmonic] agrees to continue to pay [petitioner] said royalties on said stock so sold and paid for, but said royalties shall cease after said harmonicas on hand have been sold and paid for.

On December 27, 1944, the petitioner sent a letter to Harmonic in which he purported to revoke the exclusive license because of an alleged breach of contract by Harmonic. Harmonic ignored the letter of revocation and continued to manufacture articles under the license.

Petitioner and Peter Christian Christensen organized International Plastic Harmonica Corporation (hereinafter called International), a corporation of the State of New Jersey, and on December 29, 1944, petitioner, Christensen, and International entered into a contract which provided in part as follows:

2. The total authorized capital stock of [International] is 2500 shares of common stock without nominal or par value. 250 shares of said stock shall be issued to [petitioner] upon the transfer to [International] of a duly executed assignment of said application for letters patent 2,348,830 and said applications for letters patent in the United States of America in Great Britian [sic] and in Canada hereinafter mentioned * * *, and in consideration of the services rendered by [petitioner]. * * * 250 shares of said stock shall be issued to Christensen for which he agrees to pay [International] the sum of $25,000.00, payable as needed.

*   *   *   *   *   *   *

4. [Petitioner] * * * by these presents does sell, assign and trásfer [sic] over to [International], all engineering data, experimental data, drawings on cover and comb mold, drawings on reed mold, drawings on assembly and inspecting fixtures, hubs for reed molds, hubs for cover molds, miscellaneous angle and other fixtures for building reed mold, experimental parts, * * *

\* \* \* \* \* \* \*

7. In case said plastic musical instruments and devices, mechanisms and molds shall be manufactured, sold, or licensed by any firm, person or corporation other than [International], so as to infringe the letters patent applied for by [petitioner], [petitioner] shall, within a reasonable time after the receipt of a written request from [International], but at the expense of [International], cooperate in taking all necessary proceedings to vindicate and protect the letters patent applications pending or letters patent issued thereon, and in default of his so doing, it shall be lawful for [International], in the name of [petitioner], if necessary or desirable, but at the cost of [International], to take all necessary proceedings for defending the same. Any and all sums that may be received, collected or recovered in any such suit, whether by decree, judgment, settlement, or otherwise, shall be paid to [International].

8. [Petitioner] covenants * * * that there are no liens or encumbrances upon said letters patent applications; * * *

9. [International] hereby agrees to employ [petitioner] as its vice president and general plant manager to be in charge of its plastic production, experimentation and research work for the term of two years from January 1, 1945, at a yearly salary of $15,000.00, * * *. [International] agrees to employ Christensen as its president and treasurer for the term of two years from January 1, 1945 at a yearly salary of $15,000.00 * * *. Said employments may be terminated on December 31, 1946 by [petitioner], Christensen, or [International] on three months prior written notice * * *. Unless said respective employments are so terminated, they, or either of them are automatically extended from year to year at the same salary and on the same terms and conditions as provided for the first two year term. * * *

10. * * * [International] shall pay to [petitioner] and Christensen in equal shares, during the life or term of said patents and patent applications, at the time said statement [of sale] is delivered, royalties upon the musical instruments manufactured and sold in that or any prior period of each of such patents or applications, but paid for in the immediately preceding period at the rates hereinafter set forth to-wit: ½ cent for each musical instrument, or any part thereof, sold, as shown by copies of customers sales invoices, at a price not over 50 cents per musical instrument or part thereof, and 1 cent for each musical instrument or part thereof, sold, as shown by copies of customers sales invoices at a price exceeding 50 cents per musical instrument or part thereof.

\* \* \* \* \* \* \*

In case of [petitioner's] death, or Christensen's death, said royalties shall be paid to the respective executor or administrator of the one so dying.

\* \* \* \* \* \* \*

12. If [International] and said Christensen shall not pay weekly payments of $288.47, said royalties or other payments herein contained and provided for, or in the performances of any of the agreements contained herein or any part thereof as herein provided, for thirty days, then said [petitioner] may at any time after such non-payment, by notice in writing served on the said Christensen and [International], terminate this agreement without prejudice to the recovery of any monies then already due to him, this agreement shall thereupon be void, and the

title to all said letters patent and all applications therefor shall revert to [petitioner], and [International] hereby agrees to execute such assignments or other papers as shall be necessary to transfer the title of said patents and applications to said [petitioner].

\* \* \* \* \* \* \*

This agreement shall remain in effect for a period of two years from January 1, 1945, and in the event that neither party gives the other three months prior notice in writing of the desire to terminate same, this agreement shall thereafter continue in full force and effect and upon the same terms and conditions for an additional period of one year and so on from year to year unless either party gives the other three months prior written notice terminating this agreement at the end of any extended yearly period.

(a) Should [petitioner] give notice of terminating the working agreement provided herein, the salary paid to [petitioner] shall cease at the end of said yearly term, or on the date that [petitioner] ceases to serve [International].

(b) Should [International] give such a notice to [petitioner] terminating this agreement, the salary of said [petitioner] shall cease on the expiration of the yearly term.

On February 27, 1945, the petitioner executed an "Assignment" under which he "sold, assigned and transferred" to International all his "right, title and interest" in his inventions, letters patent, and applications for letters patent. Petitioner also transferred to International under this instrument, all claims and demands for damages or profits accrued or which would accrue on account of any infringements of the patents transferred to International.

When International was organized, its books of account showed a debit to cash of $25,000 reflecting the payment by Christensen and a debit to patents of $25,000 reflecting the patent assignment by the petitioner. Capital stock was credited with $50,000 for 500 shares of stock issued therefor on June 25, 1945, 250 shares to petitioner and 250 shares to Christensen. Subsequently, the patent account was debited with $15,000, the machinery and equipment account was debited with $15,000, and capital stock was credited with $25,000. No additional stock was issued. In April 1946 the effect of these last entries was eliminated by reversal entries. No further changes were made in the patent account on the books of International.

Christensen transferred, among other assets, his 250 shares of stock to a trust created May 9, 1946, for his sole benefit. The trustees sold all the stock on May 17, 1946, 50 shares to the petitioner and 200 shares to International. Since that date neither Christensen nor his trustees were stockholders of International. International continued to make payments under the agreement of December 29, 1944, as amended, to the Christensen trust until April 1952, the date of Christensen's death. On May 18, 1946, International issued 25 shares to John E. Toolan, 50 shares to Arthur Blumenschine, and 25 shares to petitioner. In December 1946 Blumenschine's shares were reacquired by

International and petitioner sold to Toolan 62½ shares. From the end of 1946 through 1951 the stockholdings in International were as follows:

|  | Shares |
|---|---|
| Finn H. Magnus | 261½ |
| Elsie A. Magnus | 1 |
| John E. Toolan | 87½ |
| Treasury stock | 150 |
| Total | 500 |

Neither Christensen nor Toolan was related to petitioner or to petitioner's wife. Neither petitioner nor his wife owned, directly or indirectly, the International stock owned by Christensen or Toolan.

On November 7, 1945, International filed a complaint against Harmonic in the United States District Court for the Eastern District of Pennsylvania charging Harmonic with unfair competition and with infringing patent No. 2,373,129. International requested the court to adjudge that the exclusive license agreement of January 15, 1944, between petitioner and Harmonic, was terminated and that International was the sole owner of the entire right, title, and interest in patent Nos. 2,339,790, 2,340,333, and 2,373,129.

In August 1946 International was negotiating a contract with certain Canadian interests under which International would manufacture and ship to the Canadian interests certain harmonica parts and International would grant the Canadian interests a license to manufacture other harmonica parts, and assemble and sell the completed instruments. Petitioner, the trustees for Christensen, and International, in order to clarify a purported ambiguity in the contract dated December 29, 1944, as to the amount of royalties due to petitioner and Christensen in the event that International granted a license in a foreign country, signed a contract dated August 6, 1946, providing that the royalties to be paid by the Canadian interests to International should be distributed in equal shares between the petitioner and the trustees for Christensen.

An agreement dated September 20, 1946, between International, petitioner, Christensen, and others provided, *inter alia*, that Christensen's right to royalties from International was to terminate at his death. It also provided that all royalty payments to Christensen "arising from the so-called Canadian contract, dated April 23, 1946," were to terminate at his death. It was also provided under this agreement that International would surrender to the trustees of the Christensen trust a series of notes evidencing a prior loan of $100,000 by International to the Button Corporation of America. Christensen was president of the Button Corporation of America.

On December 14, 1946, International and petitioner entered into an agreement "for the use and benefit of Peter C. Christensen." The

purpose of this agreement was "to clarify and declare the intention of the parties respecting the liability of INTERNATIONAL to pay royalties under the contract of December 29th, 1946 [*sic*]," as amended, on articles sold by International to its customers. Section 4 of this agreement is as follows:

4. INTERNATIONAL shall pay Peter C. Christensen the same royalty it pays [petitioner] as above provided, except that INTERNATIONAL'S liability to Christensen shall end upon the death of Christensen, or upon the expiration of the life of said patents, whichever event sooner occurs.

International and Harmonic reached a settlement agreement, dated December 16, 1946, which was incorporated in a decree of the District Court dated December 30, 1946. The settlement agreement contained the following provisions:

1. International

(a) Shall and does hereby grant to Harmonic a personal non-exclusive and non-assignable license to manufacture and sell harmonicas and reed plates and reeds for harmonicas, toys and novelties covered by said U. S. Patent No. 2373129 and U. S. Patent No. 2407312 and including the invention or inventions described and covered in such patents and to practice the inventions described and covered by said Patents and U. S. Patent Application Serial No. 521940 in the manufacture of said harmonicas and reed plates and reeds for harmonicas, toys and novelties. International shall not grant a license to any other person, firm, corporation or other entity to manufacture and sell harmonicas or reed plates and reeds for harmonicas, toys or novelties in accordance with the inventions covered by said Patents and Patent Application. International shall and hereby does reserve to itself all rights of ownership of said patents and patent applications not herein granted to Harmonic or denied to International, including (without excluding other rights) expressly the right to manufacture and sell harmonicas and reed plates and reeds for harmonicas, toys and novelties in accordance with the inventions covered by said patents and patent application. The non-exclusive license granted Harmonic as aforesaid shall extend to all countries of North and South America, insofar as International has or shall acquire a patent or patents in any such country covering said inventions.

2. Harmonic

(a) Shall, simultaneously with the execution and delivery of this agreement, pay [petitioner] the sum of Six thousand nine hundred thirty-two dollars and seventy-one cents ($6,932.71) representing the balance due [petitioner] on the following account:

Royalties at the rate of $.01 per harmonica on 986,971 harmonicas manufactured and sold by Harmonic under said U. S. Patent No. 2373129 and paid for by its customers prior to October 1, 1946_____ $9869. 71

Deduct—

Balance due by [petitioner] to Harmonic on loan of $7918.25 _____ $2918. 25

Interest on monthly payments due on said loan_____ 18. 75    2937. 00

Balance _____ 6932. 71

(b) Shall pay International for the account of [petitioner] and the executors, administrators and assigns of [petitioner] during the life of the patents granted on said inventions the following royalties on all harmonicas and reed plates and

reeds for harmonicas, toys and novelties described and covered by said U. S. Patent No. 2373129 and U. S. Patent No. 2407312 and including the invention or inventions described and covered in such patents or either of them and/or manufactured through the practice of the inventions described and covered by said Patents and U. S. Patent Application No. 521940 or any of them, sold by Harmonic at any time and paid for by its customers on and after October 1, 1946, viz:

## DURING THE LIFETIME OF CHRISTENSEN

Harmonic shall pay International (1) for each such harmonica incorporating standard harmonica reed plates and reeds consisting of a blow reed plate with ten reeds and a draw reed plate with ten reeds a royalty of $.01, and (2) for each such harmonica, toy or novelty incorporating different reed plates or a different number of reeds a sum which will equal the product of $.01 multiplied by a fraction of which the numerator shall be the number of reeds incorporated in such harmonica, toy or novelty, and the denominator shall be twenty.

## AFTER THE DEATH OF CHRISTENSEN

Harmonic shall pay for each such harmonica, toy and novelty one-half of the royalty provided to be paid during the lifetime of Christensen.

\* \* \* \* \* \* \*

If at any time the royalty rate required to be paid by International pursuant to its agreement mentioned above with [petitioner] and said Peter C. Christensen is reduced or if the terms thereof are changed in any particular so that as a result of such reduction or change the rate or terms thereof are more favorable to the licensee than the foregoing royalty required to be paid by Harmonic, then the rates and terms of the Harmonic royalty shall be forthwith reduced or changed to such more favorable terms, it being the intention hereof that Harmonic shall at no time be required to pay to International a higher royalty or on less favorable terms to it than International itself is obliged to pay.

\* \* \* \* \* \* \*

4. International and Harmonic agree that

(a) Only International and Harmonic shall have the right to manufacture and practice the inventions mentioned in the claims under the said patents and patent application.

\* \* \* \* \* \* \*

6. Upon the execution and delivery of this agreement all agreements heretofore entered into or alleged to have been entered into between Harmonic and [petitioner], including specifically the written contract dated January 15, 1944, shall become null and void.

On June 23, 1947, International's name was changed to Magnus Harmonica Corporation, hereinafter called Magnus Harmonica. In 1951 Harmonic paid to Magnus Harmonica a total of $11,437.22 for the account of the petitioner in accordance with the settlement agreement of December 16, 1946. These payments were debited to cash on the books of Magnus Harmonica and credited to the petitioner's account, and when these amounts were paid by Magnus Harmonica to the petitioner, the cash account would be credited and petitioner's account debited. The amounts received by Magnus Harmonica from Harmonic and paid to the petitioner were not included by Magnus

Harmonica in its gross income on its Federal income tax returns and no deductions were claimed by the corporation on its returns for the payments to the petitioner of the amounts received from Harmonic.

Petitioner in 1951 reported as long-term capital gain the receipt of $18,638.76 from Magnus Harmonica and $11,437.22 from Harmonic with the following explanation:

Royalties received from grant of exclusive rights of manufacture and sale under inventions, designs, patents and patent applications * * * despite Mimeo. Ruling #6490, pending court decision on the issue.

OPINION.

Petitioner contends that the amount of $18,638.76 received by him in 1951 from International, a corporation controlled by him, during the taxable year, represents a portion of the consideration for the transfer of certain harmonica patents by him to International, and therefore it is taxable as a capital gain. Respondent argues that International's agreement to pay royalties to the petitioner and Christensen was not in consideration for petitioner's purported transfer of patents and patent applications to International, and that the royalty payments were no more than disguised dividends. In the alternative, respondent argues that the transfer of the patents by petitioner to International was merely a license and that the payments received by petitioner under such transfer are royalties to be taxed as ordinary income.

When International was formed in 1944, it was agreed that petitioner would transfer his patents to the corporation and that Christensen would contribute $25,000. It was further agreed that 250 shares of stock in International were to be issued to the petitioner "upon the transfer to [International] of a duly executed assignment of said application for letters patent 2,348,830 and said applications for letters patent in the United States of America in Great Britian [sic] and in Canada hereinafter mentioned * * * and in consideration of the services rendered by [petitioner]. * * * 250 shares of said stock shall be issued to Christensen for which he agrees to pay [In ternational] the sum of $25,000.00, payable as needed." This stock, it is apparent to us, was the consideration for the transfer of the letters patent and the cash contribution by the two parties to the corporation. Elsewhere in the same agreement it was provided that International was to pay to petitioner and to Christensen, in equal shares, a royalty on instruments sold during the life of the patents. The payments here in dispute were made by International to petitioner under this provision, and petitioner argues that this royalty, in addition to the 250 shares of stock received by him, was consideration for the transfer of the letters patent.

It seems apparent from all of the facts and the testimony of petitioner that the understanding between petitioner and Christensen at the time of the execution of the December 29, 1944, agreement, was that the latter was to invest $25,000 to exploit the patent and receive one-half of the profits. This was accomplished by petitioner's transferring his patent to the corporation and taking one-half of the stock and Christensen's paying to the corporation $25,000 and taking one-half of the stock. Any further agreement whereby the manufacturing corporation would pay the equal shareholders a royalty in equal portions is mere surplusage and without any consideration. To hold otherwise would mean the owner of a patent or the owner of a mine could transfer the patent or mine to his wholly owned corporation for the stock and take back from his own creature a royalty contract that would allow deductions for royalty paid and capital gains treatment for royalty received. When, because of ownership of stock interest, the full profits from the manufacturing enterprise will inure to the patent owner, any agreement to pay royalty becomes an agreement to pay part of the corporation profits to the stockholder, which is a dividend payment. Much the same situation existed in *Ingle Coal Corporation*, 10 T. C. 1199, affd. 174 F. 2d 569. There a coal-mining corporation with a lease to mine coal for 20 years was dissolved and in transactions that occupied a space of time of about 30 minutes the assets were distributed, and the stockholders transferred what they received to a new corporation taking stock in the exact proportion of the old and a royalty contract whereby the new corporation agreed to pay the stockholders 5 cents a ton royalty. Thereafter the new corporation took a deduction for royalties paid. We held the payments were not deductible saying (10 T. C., at 1205) :

We think, under the circumstances, the payment of this additional 5 cents per ton as an overriding "royalty" was a distribution of corporate profits to the stockholders receiving the same and therefore was not a deductible expense, either as a "royalty" or otherwise. See also *Atlantic Monthly Co.*, 5 T. C. 1025.

An analogous case is *Albert E. Crabtree*, 22 T. C. 61, affirmed per curiam 221 F. 2d 807, where the petitioners purported to transfer an automobile franchise to a corporation in return for all of the stock of the corporation and the corporation's promise to pay to them 50 per cent of the corporation's profits for a period of 10 years. We held that the payments of 50 per cent of the profits were nothing more than disguised dividends. At page 64 we said:

The franchise was transferred to the corporation for all of its stock. In addition, the corporation promised to pay to petitioners one-half of its net profits for 10 years. But the stock itself was full and adequate consideration for the franchise. Moreover, as the owners of all the stock petitioners were in a posi-

tion to control the future distribution of corporate profits to themselves from year to year, and we are satisfied that the provision for paying out 50 per cent of the profits for 10 years was merely an anticipatory arrangement for the distribution of dividends over that period. Crabtree himself admitted that he and O'Keefe could, with equal facility, have provided for the distribution of profits to the extent of 10, 20, 50, 80, or even 100 per cent, and that the 50 per cent figure was selected merely on advice of counsel. No evidence was presented as to any convincing business reason, apart from tax considerations, for this arrangement.

We do not, of course, suggest that tax motives will render nugatory a bona fide business arrangement. The difficulty with petitioners' position here is that we cannot find that the payments in question were in fact part of the consideration for the franchise. Instead, it is our conclusion that although these payments may have been cast in that form, they were in truth and in fact merely distributions of corporate earnings, masquerading as something that might produce more beneficial tax consequences. Cf. *Ingle Coal Corporation*, 10 T. C. 1199, affirmed 174 F. 2d 569 (C. A. 7) ; *Pompeian Manufacturing Co.*, 1 B. T. A. 825. * * *

It is true that ordinarily the transfer of a monopoly interest in a patent in return for an agreement to pay royalty for the life of the patent is a capital transaction. But where the transfer is to their wholly owned company and the contract is to pay them royalty, the transaction should be carefully scrutinized. As we said in *Heatbath Corporation*, 14 T. C. 332, 347 :

> Ordinarily the amounts which a corporation must pay under an agreement for the use of a patent would be deductible in their entirety as ordinary and necessary expenses, and neither the Commissioner nor the Court would have any authority to rewrite the agreement of the parties. But where, as here, the parties contracting with the corporation and the wife of one of those parties hold practically all of its stock and, as a consequence, make the decisions for the corporation, the terms of their agreement may be examined to see whether the amounts to be paid may fairly be regarded as compensation for the use of the patent or represent, to some extent, dividends in disguise. Cf. *L. Schepp Co.*, 25 B. T. A. 419; *Granberg Equipment, Inc.*, *supra*; *Atlantic Monthly Co.*, 5 T. C. 1025. * * *

It is our conclusion that the royalty payments provided for cannot be regarded as consideration to the petitioner for the transfer of the letters patent and the patent applications to International. We are persuaded that the two parties, petitioner and Christensen, were, under the agreement of December 29, 1944, making capital contributions to International in return for equal portions of that corporation's stock.[1] Once the letters patent and patent applications were transferred to International as capital contributions, there could be no reason for the corporation to assume an obligation to pay royalties for the use of such assets. We cannot see what consideration passed

---

[1] It was also provided in the agreement of December 29, 1944, that the "2,000 shares of the stock of [International] then remaining shall not be sold or otherwise disposed of except to Magnus and Christensen in equal amounts."

to the corporation in return for this obligation assumed by it. It is obvious that the mere designation of the payments as royalties does not legally characterize them as such. *Ingle Coal Corporation, supra.* Nor does the fact that the corporation, International, was under a binding obligation to make these payments serve to characterize them as royalties. *Interstate Transit Lines,* 44 B. T. A. 957, affd. 130 F. 2d 136, affd. 319 U. S. 590. The agreement here was obviously not at arm's length, and we are convinced that under such agreement an unnecessary obligation was placed upon International. See *Ingle Coal Corporation, supra.*

It is also significant that the royalty payments to petitioner, which petitioner contends are consideration for the letters patent, were made in equal amounts to Christensen, who had absolutely no interest in such patents. We hold that, under the facts here, the payments by International to the petitioner were distributions of corporate profits and are taxable to him as such. It is true that there is no evidence as to the amount of earnings and profits of International in 1951, when the disputed payment was made to the petitioner. Sec. 115 (a), I. R. C. 1939. However, the respondent's determination is presumed to be correct, and absent any evidence on the amount of earnings and profits, we must uphold that determination. *Gustav W. Lembeck,* 16 B. T. A. 250.

Petitioner makes the further contention that these royalty payments to petitioner cannot be regarded as dividends by the corporation because they continued to be made to Christensen for several years after Christensen had ceased to be a stockholder of International. We fail to see the relevancy of this argument. International, for reasons thought best to the parties, assumed an obligation to make equal payments to petitioner and to Christensen based on the instruments sold over the life of the patents. This obligation remained in force after Christensen disposed of his stock. We have decided that this obligation cannot be regarded as consideration for the letters patent. We are concerned here only with the treatment of this payment in the hands of the petitioner. Simply because a similar payment is made to a nonstockholder, whatever the reason, does not in the least prevent the payments to petitioner from being categorized as dividends.

The second point has to do with the money received in the settlement of the lawsuit and the payments made by Harmonic. Petitioner granted an exclusive license to Harmonic in 1944 to manufacture and sell harmonicas, and on December 27, 1944, revoked the license. Harmonic continued to manufacture and sell harmonicas

after the revocation, and in November 1945, International, to which petitioner transferred all of his right, title, and interest in the relevant patents and patent applications, brought suit against Harmonic for patent infringement. A settlement was reached, and the amount of $11,437.22 here in dispute was received by the petitioner under the terms of this settlement. This agreement, under date of December 16, 1946, and incorporated in a court decree dated December 30, 1946, provided that International was to grant to Harmonic a personal, nonexclusive, and nonassignable license to manufacture and sell harmonicas under the relevant patents. Harmonic agreed to pay to petitioner the amount of $6,932.71 representing royalties on harmonicas sold by Harmonic and paid for by its customers prior to October 1, 1946, and, in addition, Harmonic agreed to "pay International for the account of [petitioner]" a royalty on instruments sold by Harmonic after October 1, 1946. It is not clear whether petitioner was deemed to have certain rights personally in the license granted to Harmonic and that he was entitled to royalty payments under the nonexclusive patent granted by International to Harmonic, or whether this was merely a device to camouflage dividend payments by International. It is difficult to see how petitioner can be regarded as being personally entitled to these royalty payments under the Harmonic license. When he agreed to transfer the letters patent to International in 1944 it was provided any "sums that may be received, collected or recovered in any such suit [for patent infringement], whether by decree, judgment, settlement, or otherwise, shall be paid to [International]." This provision seems clear enough to entitle International to the royalties paid by Harmonic under the settlement agreement. However, it is not necessary to decide this, since for the purposes of this controversy, the payments to the petitioner, under either theory, would be taxable as ordinary income.

Petitioner's argument for capital gains treatment of this amount received from Harmonic via International is that it too represents "proceeds from the sale of a harmonica invention and the patents and patent applications pertaining thereto, which were capital assets held for more than six months, taxable as long term capital gains at capital gains tax rates." This is essentially the same argument made by petitioner on the first issue, and we must reject it for the reasons given in our discussion of that issue. We cannot find as a fact that the royalty payments by Harmonic to International for the account of petitioner were consideration for the transfer of patents by petitioner, presumably to International.

*Decision will be entered for the respondent.*