A. E. HICKMAN AND JOYCE HICKMAN, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 54014, 54015, 54016. Filed February 18, 1958.

---

[1] Proceedings of the following petitioners are consolidated herewith: B. Frank Morris and Irma Crall Morris, Docket No. 54015; Irma Jean Crall, a Minor, Irma F. Morris, Guardian, Docket No. 54016.

*Sam G. Winstead, Esq.*, for the petitioners.
*Charles J. Sullivan, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined income tax deficiencies and additions to tax in these consolidated proceedings as follows:

| Petitioner | Docket No. | Year | Deficiency | Additions to tax | |
|---|---|---|---|---|---|
| | | | | Sec. 294 (d) (1) (A) | Sec. 294 (d) (2) |
| A. E. Hickman and Joyce Hickman | 54014 | 1951 | $4,389.04 | $589.32 | |
| | | 1952 | 4,676.74 | 636.54 | |
| B. Frank Morris and Irma Crall Morris | 54015 | 1951 | 4,400.38 | 615.42 | |
| | | 1952 | 4,759.94 | 776.09 | $532.18 |
| Irma Jean Crall, a minor, Irma F. Morris, guardian | 54016 | 1951 | 2,651.28 | | |
| | | 1952 | 2,229.49 | 325.01 | 216.68 |

The issues before the Court are: (1) Whether certain amounts received by petitioners in Docket Nos. 54014 and 54015, in connection with the transfer of a patent, are taxable as ordinary income or as long-term capital gains; and (2) whether the petitioners in Docket Nos. 54014 and 54015 are liable for additions to tax for the years 1951 and 1952 under section 294 (d) of the 1939 Internal Revenue Code. Petitioner has conceded the correctness of the income tax deficiency and the additions to tax determined by the respondent in Docket No. 54016.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by reference.

Petitioners B. Frank and Irma Crall Morris, husband and wife, are residents of Pampa, Texas. They filed joint Federal income tax returns as follows:

866

| Year | Date filed | Place filed |
|------|-----------|-------------|
| 1951 | Jan. 15, 1952 | Collector of internal revenue, second district of Texas |
| 1952 [1] | Jan. 19, 1953 | District director of internal revenue, Dallas, Texas |
| 1952 [2] | Mar. 19, 1953 | District director of internal revenue, Dallas, Texas |

[1] Original return.
[2] Amended return.

Irma Crall Morris, hereinafter referred to as Irma Crall, the widow of William R. Crall, married B. Frank Morris on October 8, 1948. Irma Jean Crall, daughter of William R. and Irma Crall, filed her 1951 Federal income tax return with the then collector of internal revenue for the second district of Texas on March 15, 1952. The 1952 Federal income tax return of Irma Jean Crall was filed with the district director of internal revenue at Dallas, Texas, on March 19, 1953.

A. E. Hickman and his wife, Joyce, are residents of Pampa, Texas. Their 1951 joint Federal income tax return was filed with the then collector of internal revenue for the second district of Texas on January 15, 1952, and their 1952 joint return was filed with the district director of internal revenue, Dallas, Texas, on January 15, 1953.

William R. Crall commenced work in the oilfields of Oklahoma in 1941 as a roughneck and driller. He moved to Pampa, Texas, in 1945 and began to concentrate on the development of a scraper designed to prevent the accumulation of paraffin on the interior of well tubings. Sometime in January or February 1946, he terminated his employment with the Brakesol Chemical Company, and from February to April of the same year he devoted practically all of his time to the planning and designing of the scraper, which was finally assembled as a working unit in the winter of 1946. On December 31, 1946, he filed an application (No. 719,442) for a patent with the Commissioner of Patents. William R. Crall died intestate on September 15, 1947, and on October 6, 1947, Irma Crall was appointed administratrix of the Estate of William R. Crall, hereinafter referred to as the estate. The entire estate, including the application for a patent, was community property, and under Texas law the decedent's wife, Irma Crall, was vested with an undivided one-half interest. Irma Jean Crall, the only child of decedent and his wife, was the sole beneficiary of the decedent's one-half of the community estate. Irma Crall, in her capacity as administratrix, succeeded to William R. Crall's rights in the patent application, and on November 9, 1948, Letters Patent No. 2,453,199 were issued to Irma Crall as administratrix of the estate. A few scrapers had been produced and sold prior to William R. Crall's death.

The type of paraffin remover covered by Letters Patent No. 2,453,199 is adapted for the continuous scraping and diffusing of paraffin accumulating on the inside of the well tubing while the well is

being pumped. The invention is based upon the attachment of spiral scrapers at longitudinally spaced intervals on the sucker rods, which are rods of a narrow diameter that move up and down within the tubing and actuate the pumps at the bottom of the well. The spiral scrapers consist of a strip of flat sheet metal of a width sufficient to contact the wall of a well tubing after they have been affixed to a sucker rod. The ends of the scrapers are attached to the sucker rod by welding and/or the use of "U" bands which are attached to the sucker rods by a shrink-grip process. In order to overcome the tendency of sucker rods which are equipped with spiral scrapers to rotate and uncouple into sections, scraper blades with opposite spiral directions are alternated when they are attached to the sucker rods.

A. E. Hickman became associated with the Bethlehem Supply Company, which sold oilfield equipment and supplies, in April 1945. Hickman met William R. Crall early in 1946, at which time Hickman was store manager and sales manager for the Bethlehem Supply Company. Shortly after the death of William R. Crall, Irma Crall and Hickman orally agreed to join together in a partnership to be called Petroleum Specialty Company, hereinafter called Petroleum. It was agreed that Petroleum would continue the business of manufacturing and selling paraffin scrapers which had been started by William R. Crall. The partnership agreement was never reduced to writing. Irma Crall and Hickman agreed that since Irma Crall was not familiar with the problems involved in operating a business, Hickman would assume responsibility for the management of Petroleum and the conduct of its sales operations. It was also agreed that the profits of Petroleum would be divided equally between Irma Crall and Hickman. Shortly after the agreement to form Petroleum, and sometime after November 6, 1947, Irma Crall and Hickman agreed that J. W. Gordon, Jr., an attorney of Pampa, Texas, should be admitted into Petroleum as a partner. Irma Crall and Hickman reduced their respective shares of the partnership profits from 50 per cent to 45 per cent, and it was agreed that the remaining 10 per cent of the profits would go to J. W. Gordon, Jr. It was the understanding of the parties that Gordon would assist in the conduct of Petroleum's affairs. Petroleum adopted a fiscal year accounting period which ended on August 31.

On October 16, 1947, Irma Crall filed with the County Court an inventory, appraisement, and a list of the claims owing to and debts owed by the estate. The estate's inventory of property included community property owned by William R. Crall and Irma Crall in the amount of $10,803.53. The patent application, then pending before the Commissioner of Patents, was included in the schedule of community property and was assigned a value of $3,500 in the probate

proceedings. On the same date, Irma Crall, as administratrix, filed with the County Court a petition for authorization to sell some of the personal property of the estate to pay some of the estate's outstanding debts. The petition asked that an order be issued "authorizing your petitioner to enter into a contract selling and conveying the exclusive rights to the manufacture of the [paraffin scraper] under such application now pending" and further stated that it would be to the best interests of the estate to sell such rights on a royalty basis. On November 6, 1947, the County Court issued an order under which it was decreed that Irma Crall, as administratrix of the estate, sell the exclusive right to manufacture under the application and any patent granted thereon for the consideration of a royalty of 10 per cent of one-half of the gross retail sales price of all products manufactured under such application or patent.

On November 6, 1947, Irma Crall, as administratrix, executed an instrument transferring to Hickman "the exclusive right to manufacture paraffin scrapers under application for patent No. 719442 pending before the United States Patent Commissioner and under patent granted thereon in so far as the undivided one-half interest in such application and patent are owned by the estate of William R. Crall, deceased." Under this instrument, Hickman agreed "to pay as royalty for such right herein conveyed * * * ten per cent of the gross retail sales price of one-half of all products manufactured under and by virtue of said application and patent * * *." On the same date, Irma Crall and Hickman executed an instrument which provided, in part, as follows:

Whereas, the said first party [Irma Crall] is the owner of an undivided one-half interest in application for patent No. 719442 pending before the United States patent commissioner, and,

Whereas, the estate of William R. Crall, deceased, is the owner of an undivided one-half interest in such application for patent and has entered into a contract with the said second party [A. E. Hickman] for the exclusive right to manufacture the product covered in such application as to the undivided one-half interest owned by such estate in such application, and,

Whereas, the parties hereto have entered into a partnership to be known as Petroleum Specialty Company and are desirous of granting to such partnership the sole and complete right to manufacture the product covered by such application for patent during the pending of such application and the life of any patent granted by virtue of such application.

Now therefore, it is agreed that the exclusive right to manufacture the product embodied and described in said application for patent is during the pending of such application and the life of any patent granted thereon here now conveyed to Petroleum Specialty Company, a partnership composed of the said Irma Crall and A. E. Hickman.

It is further agreed that such partnership assumes and agrees to pay a royalty of ten per cent on one-half of the gross retail sales price of all products manufactured under or by virtue of such application and patent to the estate of William R. Crall, deceased.

The conveyance of November 6, 1947, from Irma Crall, administratrix, to A. E. Hickman; the order of court of the same date authorizing the conveyance; and the conveyance from Irma Crall, individually, together with A. E. Hickman, to the partnership, also dated November 6, 1947, refer to the "exclusive right to manufacture" the product covered by the patent application. The method of payment referred to and provided for in said agreements and order of court was based on gross sales price of the product, and sale of the product as well as manufacture was contemplated. No use of the product other than manufacture and sale was made by any of the parties. Irma Crall, administratrix, intended to and did, on November 6, 1947, convey to said Hickman, the entire undivided one-half interest of the Estate of William R. Crall in the pending patent application and any patent granted thereunder. Irma Crall, individually, and A. E. Hickman intended to and did, on November 6, 1947, convey to said partnership their entire respective undivided one-half interests in said pending patent application and any patent granted thereunder.

The patent application was not included as an asset on the balance sheet of the partnership filed as part of its partnership return of income for the fiscal year ended August 31, 1948, and the payments to or for the benefit of the minor, Irma Jean Crall, in relation to the transfer of the estate's interest in the patent application were deducted as "patent royalty" and "royalty" on the partnership returns for the fiscal years ended August 31, 1948 and 1949. The profit from "sale of patent" by the partnership to the corporation on January 3, 1949, was reported by the partnership as long-term capital gain on the partnership return for the fiscal year ended August 31, 1949.

During its first fiscal period of operation, ending August 31, 1948, Petroleum had gross sales of $143,023.81, cost of sales of $54,927.48, and a net profit, after making payments to the estate, of $40,852.29. During its second fiscal period, which actually covered a period of active operations from September 1, 1948, to January 2, 1949, Petroleum showed gross sales of $99,888.37, cost of sales, $43,467.40, and a net profit of $34,164.58.

Petroleum Specialty Company, a Delaware corporation hereinafter referred to as Specialty, was incorporated on January 3, 1949. The capital stock of Specialty was owned 45 per cent by Irma Crall, 45 per cent by A. E. Hickman, and 10 per cent by J. W. Gordon, Jr. Specialty was organized with a capital and paid-in surplus of $30,000. Certain assets of Petroleum were transferred to Specialty in full payment for and in consideration of the issuance to Petroleum's partners of all of Specialty's capital stock. These assets included equipment and machinery, accounts receivable, bank deposits, and certain real property.

On January 3, 1949, a "Bill of Sale" was executed by A. E. Hickman, Irma Crall, J. W. Gordon, Jr., and Specialty, which provided in part, as follows:

WHEREAS, the undersigned partners, operating a partnership under the firm name of Petroleum Specialty Company, are the owners of Patent No. 2453199, and

WHEREAS, the undersigned desire to sell and assign said patent to Petroleum Specialty Company, a corporation organized under the laws of the State of Delaware for the consideration hereinafter provided,

Now THEREFORE, the undersigned do hereby sell, assign and transfer to the said Petroleum Specialty Company all our right, title and interest in and to said patent. In consideration of this sale, Petroleum Specialty Company agrees as follows:

The instrument also stated that in consideration of the foregoing sale, Specialty agreed to assume the obligation to pay to Irma (Crall) Morris as guardian of Irma Jean Crall the amounts prescribed in the agreement of November 6, 1947, and in addition, to pay the following amounts to the partners in Petroleum:

| Percentage payment | Gross retail sales |
|---|---|
| 10 | 0 —$100, 000 |
| 15 | $100, 000. 01– 200, 000 |
| 20 | 200, 000. 01– 300, 000 |
| 25 | 300, 000. 01 and over |

Specialty showed the following results from its operations in the fiscal years ended October 31, 1949 and 1950:

| | 1949 | 1950 |
|---|---|---|
| Gross sales | $231, 026 | $367, 929. 96 |
| Cost of sales | 129, 559 | 203, 210. 67 |
| Net income | 25, 741 | 49, 089. 30 |

Payments, called "Patent Cost Percentage of Sales" on its return, were made in these 2 fiscal years by Specialty to A. E. Hickman and his wife, B. Frank and Irma Crall Morris, and to J. W. Gordon, Jr., and included by Specialty in its cost of sales for those years, totaling $28,281 in fiscal year 1949 and $53,167 in fiscal year 1950. Immediately prior to the years 1951 and 1952, Specialty undertook an expansion program, under which it acquired more salesmen, did more advertising (including national advertising), purchased additional equipment, and installed new plants in west Texas and Oklahoma.

The following amounts were received from Specialty by Irma Jean Crall, Irma Crall and her husband, B. Frank Morris, and A. E. Hickman during the years 1951 and 1952:

| Year | Irma Jean Crall | Irma Crall and husband | A. E. Hickman |
|------|-----------------|------------------------|---------------|
| *1951* | | | |
| Payments received on a percentage of sales basis | $14,950.43 | $19,520.74 | $19,520.74 |
| Salary | | 9,300.00 | 15,200.00 |
| Salary | | 5,400.00 | |
| | 14,950.43 | 34,220.74 | 34,720.74 |
| *1952* | | | |
| Payments received on a percentage of sales basis | 12,765.89 | 18,325.74 | 18,325.75 |
| Salary | | 13,350.00 | 15,200.00 |
| Salary | | 1,350.00 | |
| | 12,765.89 | 33,025.74 | 33,525.75 |

The payments received by the parties on a percentage of sale basis were reported by them in their income tax returns for those years as long-term gains from the sale of a capital asset.

None of the following assignments or conveyances were recorded in the Patent Office:

(1) The November 6, 1947, transfer by the estate to A. E. Hickman of "an exclusive right to manufacture" under the patent application and any patent granted thereon;

(2) A. E. Hickman's and Irma Crall's respective November 6, 1947, conveyances to Petroleum of "exclusive rights to manufacture" under the application and any patent granted thereon;

(3) The January 2, 1949, sale, assignment, and transfer by Irma Crall and A. E. Hickman to Specialty of all their right, title, and interest in the patent.

By the transfer of January 3, 1949, Petroleum (the partnership) transferred to Specialty (the corporation) all substantial rights in Patent No. 2,453,199, and said transfer was a sale of a capital asset held longer than 6 months by the partnership.

Petitioners' 1951 and 1952 Federal income tax returns were prepared by W. B. Colwell, who operated the W. B. Colwell Tax Service in Pampa, Texas. Colwell was a public accountant. About half of his work consisted of making out Federal income tax returns. The remainder of his work was auditing and general bookkeeping. He was well and favorably known for his work, including income tax. Petitioners, in Docket Nos. 54014 and 54015, consulted him with respect to the filing of declarations of estimated tax for the years 1951 and 1952. Petitioners in Docket No. 54014 filed their income tax return for 1951 on January 15, 1952, and their return for 1952 on January 15, 1953, and did not file a declaration of estimated tax for either year. Petitioners in Docket No. 54015 filed their income tax return for the year 1951 on January 15, 1952, and filed their 1952 return on January 19, 1953. They did not file a declaration of estimated tax for either year.

OPINION.

### I.

The first issue before us is whether certain amounts received by petitioners A. E. Hickman and his wife, Joyce, and B. Frank Morris and his wife, Irma Crall, pursuant to the instrument of January 3, 1949, are ordinary income or long-term capital gain. It is the contention of the petitioners that this instrument, which was designated as a bill of sale, constituted a sale of a patent covering a new type of paraffin remover in oil wells to Specialty, a corporation whose stock was owned 45 per cent by Irma Crall, 45 per cent by A. E. Hickman, and 10 per cent by J. W. Gordon, Jr., an attorney. On the other hand, respondent construed the instrument as nothing more than a licensing arrangement. It has been conceded by the petitioners on brief that they are not entitled to the benefits of section 117 (q) of the 1939 Internal Revenue Code under the facts of this case.

It is clear that the transfer of a patent results in a capital gain or loss if the patent was a capital asset in the hands of the transferor and if the transaction amounted to a sale or assignment as distinguished from a license agreement. *Lynne Gregg*, 18 T. C. 291, 300 (1952), affirmed per curiam 203 F. 2d 954 (C. A. 3, 1953). It is not necessary that the payment from the transfer be a lump sum in order to constitute capital gain, but may be cast in the form of a percentage of sale or profits, or an amount per unit manufactured or sold, or any combination of the foregoing. *Carl G. Dreymann*, 11 T. C. 153, 163 (1948) ; *Edward C. Myers*, 6 T. C. 258 (1946). Whether the transaction resulted in a sale or a license is essentially a question of fact. The label or name of the instrument of transfer and the use of such words as "royalty," "license," or "sale" are not determinative. In *Rose Marie Reid*, 26 T. C. 622 (1956), we said, in part (p. 632) :

The transaction suffices as a sale or exchange if it appears from the agreement and surrounding circumstances that the parties intended that the patentee surrender all of his rights in and to the invention throughout the United States or some part thereof, and that, irrespective of imperfections in draftsmanship or the peculiar words used, such surrender did occur. * * *

We are persuaded, after an examination of the pertinent agreements and careful analysis and consideration of the oral testimony, that the instrument of January 2, 1949, was intended by the parties as a sale of the patent to the corporation; that the vendors owned all of the substantial rights in said patent; and that such instrument effectively carried out such intent. In searching out the intention of the parties, we are not restricted to the instruments themselves. *Allen* v. *Werner*, 190 F. 2d 840 (C. A. 5, 1951). To obtain a full understanding of the transaction, it is necessary to relate some of the prior events. On November 6, 1947, Irma Crall, as administratrix

of her husband's estate, executed an instrument transferring to Hickman "the exclusive right to manufacture paraffin scrapers under application of patent No. 719442 pending before the United States Patent Commissioner and under patent granted thereon in so far as the undivided one-half interest in such application and patent are owned by the estate of William R. Crall, deceased." Under this instrument Hickman agreed "to pay as royalty for such right herein conveyed * * * ten per cent of the gross retail sales price of one-half of all products manufactured under and by virtue of said application and patent * * *." On the same date, Irma Crall and Hickman executed an instrument which provided in part as follows:

Whereas, the said first party [Irma Crall] is the owner of an undivided one-half interest in application for patent No. 719442 pending before the United States patent commissioner, and,

Whereas, the estate of William R. Crall, deceased, is the owner of an undivided one-half interest in such application for patent and has entered into a contract with the said second party [A. E. Hickman] for the exclusive right to manufacture the product covered in such application as to the undivided one-half interest owned by such estate in such application, and,

Whereas, the parties hereto have entered into a partnership to be known as Petroleum Specialty Company and are desirous of granting to such partnership the sole and complete right to manufacture the product covered by such application for patent during the pending of such application and the life of any patent granted by virtue of such application.

Now therefore, it is agreed that the exclusive right to manufacture the product embodied and described in said application for patent is during the pending of such application and the life of any patent granted thereon here now conveyed to Petroleum Specialty Company, a partnership composed of the said Irma Crall and A. E. Hickman.

It is further agreed that such partnership assumes and agrees to pay a royalty of ten per cent on one-half of the gross retail sales price of all products manufactured under or by virtue of such application and patent to the estate of William R. Crall, deceased.

Irma Crall and Hickman testified that it was their intention to exploit the possibilities of the new scraper under a partnership in which each had a 50 per cent interest. They both testified that it was their purpose, under the instrument executed by Irma Crall in her capacity as administratrix of her husband's estate, that Hickman was to obtain outright ownership of a one-half interest in the patent, and that the only right remaining in the estate would be the right to receive the designated "royalty" payments from Hickman. There was also testimony that the parties intended to transfer their full interest in the patent to the partnership formed by them. J. W. Gordon, Jr., the attorney who prepared the instruments, testified that he drew such instruments with the objective of carrying out the full intent of the parties in the above respects both as to nature of the interest in the patent transferred to Hickman by the estate and the interest held by each in the partnership.

The instrument providing for the transfer from the administratrix to Hickman expressly refers to "the exclusive right to manufacture" the product. The terms of payment provided therein clearly show that the right to sell was also intended. In any event, as respondent concedes on brief, the right to sell the product manufactured is necessarily implied under the circumstances of this case. While there is no reference in the instrument to use, it is clear from the surrounding circumstances that the factor of use (beyond manufacture and sale) was of no practical significance to either party. Moreover, the oral testimony, which we think is credible as well as uncontradicted, and which we accept, shows that it was intended that the entire undivided one-half interest of the estate in the patent application and any patent thereunder be conveyed by the administratrix to Hickman. The estate had no practical reason to retain an interest in the patent. See *Rose Marie Reid, supra; Parke, Davis & Co.*, 31 B. T. A. 427, 430 (1934). Cf. *Ernest E. Rollman*, 25 T. C. 481 (1955), reversed 244 F. 2d 634 (C. A. 4, 1957). The actual and practical construction of the transfer by the interested parties supports the view that the intent was to convey the estate's entire interest in the patent application and any patent issued thereunder. In *Reynolds Metal Co. v. Skinner*, 166 F. 2d 66 (C. A. 6, 1948), the court said, in part (p. 71) :

But when an ambiguous term is given a practical interpretation by the parties in the course of their dealings, that interpretation will be applied by the courts.

What we have said with respect to the transaction of November 6, 1947, between the administratrix and Hickman applies equally to the transaction of the same date in which the respective undivided one-half interests of Hickman and Irma Crall in the patent application and any patent issued thereunder was transferred by them to the partnership, and our discussion need not be repeated.

It follows from what has been said above that the partnership acquired all of the substantial rights in the patent application, and the patent which was subsequently issued thereunder. When the partners, on January 3, 1949, by bill of sale sold, assigned, and transferred to the corporation "all our right, title and interest in and to said patent," at a time when the partnership was the owner of all substantial rights under the patent, the effect was a sale of all such rights by the partnership to the corporation. It is also clear that the terms of payment were not inconsistent with a sale. *Carl G. Dreymann, supra; Edward C. Myers, supra.* It is apparent that the patent is to be treated as a capital asset (whether under section 117 (a) or (j) is not here significant) and there is no question about the fact that the asset was held by the partnership for more than 6 months. Petitioners in Docket Nos. 54014 and 54015 are therefore entitled to capital gains treatment of the gain from the sale to the corporation on January 3, 1949.

Respondent makes the further argument that, even if we should construe the transfer of the patent to the corporation as a sale, a portion of the payments made to Irma Crall and to A. E. Hickman by the corporation represented dividends or compensation for services rendered and is therefore taxable as ordinary income. We do not agree. The compensation paid to Irma Crall and her husband, on the one hand, and to A. E. Hickman on the other, was approximately $15,000 in each of the years 1951 and 1952. We cannot say that this was inadequate, in view of the nature of the operations of the corporation. Nor can we say that a portion of the payments are disguised dividends to the parties concerned. The valuation of a patent is admittedly difficult. Here, the parties resolved the difficulty by establishing a rate of payment per unit sales. Such arrangement is a common one. Viewed in the background of the circumstances in January 1949, when the sale was made, we think that the parties agreed upon terms which were neither unreasonable nor unfair. During the fiscal year 1948, which was the first year of the partnership's operations, the partnership realized a net profit of $40,852.29, after payments to the Crall estate. During the 5-month period preceding the formation of the corporation, the partnership showed a net profit of $34,164.58, indicating a pronounced growth in the sales of the scraper. It would not be unreasonable, with this background, to anticipate an average annual profit in the vicinity of $90,000 for the fiscal years immediately ensuing before taking into consideration payments made under the patent contract. During the years 1950, 1951, and 1952, the average annual payments to petitioners and to J. W. Gordon, Jr., were approximately $44,000. In the fiscal year 1950, the corporation showed a net income of $49,089.30, after taking into consideration payments made under the patent contract. In the fiscal years 1951, the net income was nominal, and in 1952 there was a small loss (both after taking into consideration payments made under the patent contract). The falling off was due to increased expenditures attributable to an expansion program which included expense of hiring additional sales help and national advertising and promotion expense, looking to the "long pull" rather than immediate profits. There was likewise expansion into new territories and the installation of new plants. It does not appear to us that the arrangement made by the petitioners for the sales price of their patent to the corporation was unreasonable. The corporation was able to establish its operation with a capital investment of $30,000, and, in the first 2 years of its operations, was able to earn an amount in excess of its initial capitalization. We hold that the sales price of the patent to the corporation was not unreasonable and that no portion of the amounts paid to the petitioners under the terms of the agreement fixing such sales price were dividends or compensation

to the petitioners in Docket Nos. 54014 and 54015. See *King* v. *United States*, — F. Supp. — (E. D. Tex., Dec. 13, 1957).

Respondent calls our attention to *Finn H. Magnus*, 28 T. C. 898 (1957), as further support for the proposition that the payments received here by the petitioners are taxable in their entirety as disguised dividends. We do not agree that the case is applicable here. In *Finn H. Magnus*, we found as a fact that the patent was not sold to the corporation by one of its two controlling stockholders but, instead, was transferred to the corporation as a capital contribution. There is no occasion here to review in detail the circumstances under which this finding was made, but we think it appropriate to call attention to the fact that, in this connection, we said, in part (p. 908):

It is also significant that the royalty payments to petitioner, which petitioner contends are consideration for the letters patent, *were made in equal amounts to Christensen, who had absolutely no interest in such patents.* [Emphasis supplied.]

No similar circumstance is present in the instant case. It is clear that *Magnus* does not stand for the proposition suggested by respondent that payments by a controlled corporation to its incorporating stockholders are necessarily to be treated as disguised dividends when made pursuant to an agreement, contemporaneous with the incorporation, under a patent transferred to the corporation. See *Sun Properties* v. *United States*, 220 F. 2d 171, 175, 176 (C. A. 5, 1955). See also *King* v. *United States, supra.*

Needless to add, our holdings herein are based upon and limited to the issues presented and the record in the instant case. The corporation is not a party to this proceeding, and we are not to be understood as determining any question of deduction by or allowance to the corporation.

## II.

Respondent determined additions to tax under section 294 (d) (1) (A) of the Internal Revenue Code of 1939 in Docket Nos. 54014 and 54015 for failure to file declarations of estimated tax for the years 1951 and 1952. (Additions to tax in Docket No. 54016 for the year 1952 under section 294 (d) (1) (A) and (d) (2) are conceded by petitioner.)

Petitioners argue that their failure to file estimated declarations for 1951 and 1952 was due to reasonable cause, and not to negligence, and urge as their supporting reason that they were entitled to and did rely upon the advice of Colwell, a public accountant (who was favorably known for income tax work) to the effect that a declaration was not required if their respective income tax returns were filed by January 15 following the taxable year. It is clear that such advice, if given, was erroneous. The burden of proof was, of course, on peti-

tioners. Assuming, *arguendo*, that they were entitled to rely upon Colwell's advice, the record does not support petitioners' factual contention. While there is testimony by Hickman that Colwell's advice was that he didn't think it was necessary to file a declaration of estimated tax if the income tax return was filed by January 15 of the succeeding year, he later qualifies this to the effect that Colwell told him that the Government would probably not assess penalties for failure to file such declaration, and that his (Hickman's) understanding was that Colwell's advice was predicated on the basis of the Government's not asserting any penalty. Irma Crall, by stipulation, adopted Hickman's testimony in this respect. Her own personal testimony on this issue was quite vague and entirely valueless.

Colwell, who should have been able to shed light on the factual situation, was not produced by petitioners as a witness despite the fact that the burden of proof rested with them.

It is our view that Colwell's advice that he did not think it necessary to file a declaration (if the ultimate return was filed by the next January 15) was not of itself unqualified, and that since, to the knowledge of petitioners, it was predicated, so the record goes, only on the probability that the Government would not assert penalties, it cannot be construed as positive and unqualified advice that a declaration was not required.

In the light of the foregoing discussion, we hold that petitioners in Docket Nos. 54014 and 54015, for the years 1951 and 1952, have not sustained their burdens of proving that the failures to file declarations of estimated tax were due to reasonable cause within the meaning of section 294 (d) (1) (A).

With respect to petitioners in Docket No. 54015 for the year 1952, we add the further fact that their income tax return was not filed until January 19, 1953. While the delay was only 4 days, we cannot hold that they followed Colwell's advice, assuming that it might otherwise have been sufficient. The delay is unexplained in the record, and we cannot substitute our guess or imagination to explain it, or to infer that the explanation might be a sufficient excuse. The only fact before us is the filing on January 19 instead of January 15. If 4 days is excusable, the next problem may be why not 10, or 20, or 30 days. Since these petitioners did not follow Colwell's advice in this respect, we must hold for this additional reason that additions to tax under section 294 (d) (1) (A) are to be applied for the year in question.

All of such additions to tax with respect to petitioners in Docket Nos. 54014 and 54015 for the years 1951 and 1952 are to be determined under Rule 50.

Respondent also determined additions to tax for the year 1952 in Docket No. 54015 under section 294 (d) (2) for substantial under-

estimate of estimated tax. This subsection, unlike section 294 (d) (1) (A), does not provide that the addition to tax for substantial underestimate of the tax is not applicable where the taxpayer shows reasonable cause for his failure to comply with the requirements of the subsection. In *H. R. Smith*, 20 T. C. 663, 669 (1953), we said:

> The applicable provision [section 294 (d) (2)] is unambiguous and contains nothing implying legislative intent that it does not apply when the taxpayer can show reasonable cause for his underestimation of estimated tax. To the contrary, the amendments made of the section in the Revenue Act of 1943 disclose that the omission of any reference to reasonable cause or similar terms as a condition for nonapplication of the statute was deliberate.

We hold, therefore, that additions to tax for 1952 under section 294 (d) (2) are to be determined under Rule 50 and applied to petitioners in Docket No. 54015.

*Decisions will be entered under Rule 50 in Docket Nos. 54014 and 54015.*

*Decision will be entered for respondent in Docket No. 54016.*